**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAWRENCE CALLOWAY,** *et al.*, | : | **CIVIL ACTION** |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **NO. 23-4034** |
| **PECO ENERGY COMPANY,** *et al.*, | : | |
| | : | |
| Defendants. | : | |

**Perez, J.**                                                                      **April 17, 2026**

## MEMORANDUM

Before the Court are Defendants' Motions for Summary Judgment (ECF Nos. 90, 91, 92, 93), Defendants' Motion to Consider the Motions for Summary Judgment Unopposed (ECF No. 112), Plaintiffs' Motion for Leave to Respond to Defendants' Motions for Summary Judgment Out of Time (ECF No. 113), and Defendants' Motion to Strike Plaintiffs' Opposition (ECF No. 122). For the reasons set forth herein, the Court grants Defendants' summary judgment motions and Plaintiffs' motion for leave to file out-of-time, denies Defendants' motion to consider their summary judgment motions unopposed, and grants in part Defendants' motion to strike.

## I.      Procedural History

On July 14, 2025, Plaintiffs filed the operative Third Amended Complaint ("TAC"), alleging Plaintiffs Lawrence Calloway, Calvin Richardson, Warren Linton, and Garry A. Lewis Sr. suffered racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. ECF No. 62. On January 14, 2026, Defendants filed four motions for summary judgment—one as to each Plaintiff. ECF Nos. 90 (summary judgment as to Plaintiff Warren Linton ("Linton MSJ")), 91 (summary judgment as to Plaintiff Calvin Richardson ("Richardson MSJ")), 92 (summary

1

judgment as to Plaintiff Garry Lewis ("Lewis MSJ")), and 93 (summary judgment as to Plaintiff Lawrence Calloway ("Calloway MSJ")). Defendants also moved to seal certain information pertaining to third-party individuals' sensitive personal information. ECF No. 94.

The case was reassigned to this Court on February 9, 2026, ECF No. 99, and the Court held a status conference with the parties on February 12, 2026. Following the status conference, the Court issued a new scheduling order, granting Plaintiffs an additional two weeks to oppose the summary judgment motions and setting a deadline of February 26, 2026. ECF No. 103. This was not the last extension requested or granted.

Plaintiffs did not oppose the motion to seal, and the Court granted the motion on February 23, 2026. ECF No. 104. With just minutes remaining in the day on February 26, Plaintiffs moved for an extension of time, explaining they needed five additional days to redact the sensitive non-party information as ordered by the Court. ECF No. 106. The Court granted the extension the next day, setting Plaintiffs' new deadline as March 3, 2026. ECF No. 107. Again, shortly before midnight on March 3, 2026, Plaintiffs asked for an additional two days, for the same reason. ECF No. 108. Again, the Court granted the motion the next day and set a new deadline of Friday, March 6, 2026. ECF No. 109.

That deadline, however, came and went with no word from Plaintiffs. No opposition briefs (either unredacted and filed under seal or redacted and on the public docket), no request for a fourth extension of time, and no explanation for the missed deadline. On Monday, March 9, 2026, Defendants moved this Court to consider their summary judgment motions unopposed. ECF No. 112. After Defendants filed their motion, the Court received a phone call from Plaintiffs' Counsel, who represented that she would file the opposition briefs that day. *See* ECF No. 132-1 ¶¶ 16–17. She did not do so. Instead, Plaintiffs waited until March 11 to move for leave to file out-of-time,

asserting the opposition would be filed the same day. ECF No. 113. Plaintiffs did not submit their opposition brief to the summary judgment motions (either unredacted and under seal or redacted and on the public docket) that day. Instead, they waited four more days, until March 15, to file the briefs—a full sixty days from the filing of the summary judgment motions and nine days past their extended deadline. *See* ECF Nos. 116 & 117 ("Opposition" or "Opp."). Two days later, Plaintiffs filed their statement of facts and exhibits in support of their Opposition. ECF Nos. 119 & 120.

On March 23, 2026, Defendants filed replies in support of their motions for summary judgment. ECF Nos. 123 (reply as to Plaintiff Lawrence Calloway), 124 & 129 (reply as to Plaintiff Garry Lewis), 125 & 129-1 (reply as to Plaintiff Warren Linton), and 126 & 129-2 (reply as to Plaintiff Calvin Richardson). Also on March 23, 2026, Defendants moved to strike Plaintiffs' Opposition because it was untimely. ECF No. 122. They also moved, in the alternative, to strike Exhibit C to Plaintiffs' Opposition, email correspondence between counsel that they argue constitutes confidential settlement negotiations, and Exhibit N to Plaintiffs' Opposition, the Declaration of Tonya Baña. *Id.*

## II.    Plaintiffs' Untimely Opposition

The Court grants Plaintiffs' Motion for Leave to File Out of Time, ECF No. 113, because it finds that, on balance, the four excusable neglect factors weigh in favor of granting Plaintiffs' motion and, in particular, because consideration of the Opposition does not change the Court's ruling on the summary judgment motions.

Under Local Civil Rule 7.1(c), a party opposing a motion must do so within 14 days, unless otherwise directed by the Court. A party who fails to timely respond risks having the Court grant the motion as uncontested, so long as doing so complies with Federal Rule of Civil Procedure 56. *See* Loc. Civ. R. 7(c). Rule 56 governs motions for summary judgment. A party moving for summary judgment must show "there is no genuine dispute as to any material fact and the movant

3

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a party fails to properly respond to an assertion of fact, the court may consider the fact undisputed or grant summary judgment if the movant's motion and supporting materials show the movant is entitled to it. Fed. R. Civ. P. 56(e). The court must still make an independent determination, however, that summary judgment is warranted. *See* Fed. R. Civ. P. 56(e) advisory committee's note to 2010 amendment ("[S]ummary judgment cannot be granted by default even if there is a complete failure to respond to the motion . . . . [T]he court may grant summary judgment only if the motion and supporting materials . . . show that the movant is entitled to it.").

Untimely filings may only be considered if the court finds the lateness was due to excusable neglect. *See Drippe v. Tobelinski*, 604 F.3d 778, 784–85 (3d Cir. 2010). Federal Rule of Civil Procedure 6(b)(1)(B) allows the court, upon motion by the party who failed to act in time, to extend the time to respond for good cause if the party shows the failure to act was due to excusable neglect. Fed. R. Civ. P. 6(b)(1)(B). To evaluate excusable neglect, courts weigh the four *Pioneer* factors: (1) the danger of prejudice, (2) the length of the delay, (3) the reason for the delay, and (4) whether the movant acted in good faith. *Perrigo Inst'l Inv. Grp. v. Papa*, 150 F.4th 206, 217 (3d Cir. 2025) (discussing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)). The Third Circuit has "also considered the diligence of the moving party as well as whether the asserted inadvertence reflects either professional incompetence or an 'easily manufactured excuse incapable of verification by the court.'" *Kimberg v. Univ. of Scranton*, 411 F. App'x 473, 477 (3d Cir. 2010) (not precedential) (citation omitted). The question of whether a party's failure to file on time is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs.*, 507 U.S. at 395. The court "must consider and balance all factors, and 'no one factor trumps the others.'" *Perrigo*, 150 F.4th at 217 (quoting

4

*In re Am. Classic Voyages Co.*, 405 F.3d 127, 133 (3d Cir. 2005)). "Under *Pioneer*, the equities will rarely if ever favor a party who fails to follow the clear dictates of a court rule where the rule is entirely clear." *Id.* at 219 (cleaned up).

First, the Court considers whether Defendants will be prejudiced by the untimely filing. The Third Circuit has explained that "prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence." *Perrigo*, 150 F.4th at 217 (citation omitted). Incurring additional expenses to litigate issues that would not need to be further litigated but for the acceptance of the late filing can prejudice the opposing party. *See, e.g.*, *Wylie v. TransUnion, LLC*, No. 3:16-cv-102, 2017 WL 4357981, at *5 (W.D. Pa. Sept. 29, 2017) (finding prejudice prong weighed slightly in favor of opposing party because allowing late filing of statement of facts would require redrafting and refiling of an already submitted reply brief).

Plaintiffs contend Defendants will not be prejudiced because the Court has not yet ruled on their summary judgment motions and the delay will not materially impact the remainder of the proceedings. *See* ECF No. 113 at 3. Defendants submit, of course, that they have been prejudiced because they already had to wait nearly two months for a response, and if the Court accepts Plaintiffs' filing, Defendants would have to prepare and submit replies, rather than prepare for trial. They also point out that the additional briefing will delay this Court's ability to resolve the summary judgment motions. The Court acknowledges that delays such as this one do not occur in a vacuum. They have downstream effects on the Court's ability to issue timely rulings and, by extension, the parties' ability to prepare the next stages of their case. Here, the additional motions and briefing in this case related to Plaintiffs' untimely Opposition have required Defendants and the Court to expend additional time litigating and evaluating motions that would not have otherwise been filed, including Defendants' motion to consider summary judgment unopposed, the

instant Rule 6(b) motion, and Defendants' motion to strike. However, with respect to Defendants' reply briefs in support of their summary judgment motions, Defendants likely would have spent time on and submitted those briefs even if Plaintiffs had filed their Opposition on time. The same is likely true for at least part of Defendants' motion to strike. Additionally, as discussed in more detail herein, consideration of the Opposition does not move the summary judgment needle to Defendants' detriment. Therefore, the Court finds the prejudice prong weighs in Plaintiffs' favor.

Second, the Court considers "the length of the delay and its potential impact on judicial proceedings." *Perrigo*, 150 F.4th at 218. "[T]his factor does not contain its own 'prejudice' component duplicative of the first *Pioneer* factor." *Id.* Courts measure delay "in absolute terms and not by reference to the import of intervening circumstances." *Id.* Accordingly, the analysis turns on the length of time between when the opposition brief should have been filed and the date Plaintiffs sought leave to file late. *Id.* Here, Plaintiffs delayed five days in filing the instant motion (and ten days to file their brief). While the five-day delay is not substantial, its impact on the proceedings cannot be overlooked. Due to the delay, Defendants have had to litigate and the Court now has to resolve, not only four summary judgment motions, but also three additional motions related to Plaintiffs' untimeliness. *See* ECF Nos. 112, 113, and 122. Additionally, the Court's resolution of the summary judgments has been delayed by the additional litigation. Nonetheless, given the minor five-day delay, the Court finds this factor is neutral.

Third, the Court looks to the reason for the delay, including whether the delay was "within the reasonable control of the movant." *Pioneer Inv. Servs.*, 507 U.S. at 395. Although no one factor trumps any other, "a number of courts have viewed the third prong as the most important of the *Pioneer* factors." *See Wylie*, 2017 WL 4357981 at *6 (collecting cases); *see also In re Am. Classic*

*Voyages Co.*, 405 F.3d at 133–34 (noting that no one factor trumps the others but relying primarily on reason for delay).

Plaintiffs' expressed reasons for the delay—that the preparation of the response was more time-intensive than initially anticipated due to the need for redactions and that Plaintiffs' Counsel experienced a disruption in access to a prescribed medication—do not justify blowing the deadline that they requested. Defendants' motion to seal, which Plaintiffs did not oppose, put Plaintiffs on notice as of January 14, 2026 that redactions would be required. *See* ECF No. 94. Additionally, the fact that drafting the briefs was more time-intensive than anticipated does not justify ignoring a deadline, especially when that deadline was selected by Plaintiffs themselves. *See* ECF Nos. 108 (requesting two-day extension), 109 (granting two-day extension). Plaintiffs could have requested an extension before the deadline passed. They did not.

An unexpected medical condition could have justified a delay in filing, but that is not the case here. Plaintiffs' Counsel could not timely fill a necessary prescription due to difficulties with her insurance carrier. The Court is not without empathy for her situation. However, Plaintiffs' Counsel knew she must fill the prescription monthly and had historically experienced similar delays. She was aware of this particular delay as early as February 24, a full week before the missed deadline. *See* ECF No. 132-1 ¶ 8. Her failure to properly plan for such delays does not justify ignoring a deadline altogether. Indeed, Plaintiffs do not contend their counsel could not have filed an extension request before the deadline passed. Moreover, Plaintiffs are represented by several attorneys in this case. If Plaintiffs' lead counsel could not timely file Plaintiffs' opposition briefs, local counsel could have assisted or requested an extension before the deadline passed. *See* *Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 377–78 (M.D. Pa. 2019) ("Particularly when other counsel of record bear equal responsibility to the client, courts have been disinclined

to grant relief based on one attorney's claimed extenuating circumstances."). They did not. They let the deadline blow past without a word.

Plaintiffs' mistake "was entirely avoidable and within [their] control." *Perrigo*, 150 F.4th at 219. The deadline was clear, unambiguous, and exactly what Plaintiffs requested. Plaintiffs provide no reasonable justification for failing to timely request an extension, failing to at least submit unredacted briefs, or failing to file on time after receiving multiple extensions. This factor, therefore, weighs decidedly against Plaintiffs. *See Advanced Fluid Sys.*, 381 F. Supp. 3d at 377–78.

Fourth and finally, the Court considers whether Plaintiffs' request is made in good faith. *Perrigo*, 150 F.4th at 219. Neither party addresses this prong in detail. Plaintiffs merely assert in conclusory fashion that their "response is being submitted in good faith, and the timing is not strategic." ECF No. 113 at 3. The Court notes Plaintiffs' Counsel's daring pattern of seeking eleventh hour extensions and, at times, blowing through deadlines entirely in this matter. *See* ECF No. 34 (requesting extension of time to amend complaint at 11:50 p.m. on the due date but filing no amended complaint on requested extended deadline); ECF No. 41 (moving to amend complaint 58 days later); ECF No. 75 (requesting extension of time to file motion to compel at 11:46 p.m. on the due date); ECF No. 79 (requesting extension of time to respond to sanctions motion at 9:25 p.m. on the due date but filing nothing on requested extended deadline); ECF No. 82 (moving for leave to file opposition to sanctions motion out of time forty-two days after requested extended deadline); ECF No. 106 (requesting extension to respond to summary judgment motions at 11:57 p.m. on the due date); ECF No. 108 (requesting second extension to respond to summary judgment motions at 11:52 p.m. on first extended deadline but filing nothing on second requested and granted extended deadline); ECF No. 113 (moving for leave to respond to summary judgment motions out

of time and stating that "Plaintiffs' Joint Brief in Opposition to Defendants' Motions for Summary Judgment is being filed today" but filing no brief that day); ECF No. 116 (filing brief in opposition to summary judgment motions three days later); ECF Nos. 119 & 120 (filing statement of facts and exhibits in support of opposition two days after filing the brief).

Plaintiffs' Counsel seems to adhere to the adage "ask for forgiveness, not permission." This Court rejects such a practice and finds it irresponsible and disrespectful to her clients, Defendants, and the Court. While the totality of Plaintiffs' Counsel's conduct is not at issue for the instant motion, the Court cannot view Plaintiffs' late filing of the Opposition under these circumstances inadvertent or accidental. *See Doyle v. United Automobile, Aerospace & Agricultural Implement Workers of Am., Local 1069*, No. 11-6185, 2018 WL 11467273, at *8 (E.D. Pa. Mar. 30, 2018) ("When the plaintiff has failed to comply with instructions of the court directing the plaintiff to take specific actions in this case, the court is compelled to conclude that the plaintiff's actions are not accidental or inadvertent but instead reflect an intentional disregard for the case and the court's instructions." (cleaned up)). Nonetheless, the delay does not appear to be strategic, nor does the Court find it is "part of a sinister, well-conceived plan to frustrate [Defendants'] efforts." *Kimberg*, 411 F. App'x at 478.

In sum, the first factor weighs in Plaintiffs' favor, the third factor weighs against them, and the second is neutral. With respect to the fourth factor, the Court declines to make a finding of bad faith at this juncture without more elaboration from the parties, so it will consider this factor neutral. In balancing the *Pioneer* factors, the Court is mindful of the Third Circuit's preference for deciding matters on the merits—especially when it comes to dispositive motions. Given that consideration of the Opposition does not win the day for Plaintiffs and, therefore, does not prejudice Defendants, the Court finds that the *Pioneer* factors weigh in Plaintiffs' favor under these

9

unique circumstances. Plaintiffs' motion for leave to file out-of-time will be granted. The Court does not, however, condone Plaintiffs' Counsel's dilatoriness or take lightly her repeated practice of shirking deadlines.

In light of the foregoing, the Court will deny Defendants' motion for consideration of their summary judgments unopposed, ECF No. 112, as moot.

## III.      Factual Background[1]

Plaintiffs were formerly employed by Defendants Exelon Business Services Company, LLC ("EBSC"), and PECO Energy Company ("PECO").[2] Defendant Exelon Corporation ("Exelon") is a utility services holding company that provides energy transmission and distribution.[3] EBSC is Exelon's business services subsidiary that provides certain support services, including legal, human resources, finance, information technology, and supply management services.[4] PECO is a subsidiary of Exelon that provides power throughout southeastern Pennsylvania.[5]

The following policies are at issue in this case:

- **Exelon's Corporate Code of Business Conduct** ("Code of Conduct") prohibits employees from using, possessing or being "under the influence of drugs or alcohol while on duty, whether or not on company premises, or in company vehicles while engaged in company business" because "[e]mployees under the influence of drugs or alcohol pose a safety risk to themselves, other employees and customers."[6] It further provides that "[b]eing untruthful in an investigation can lead to discipline, up to and including termination."[7]

- **Exelon's Drug and Alcohol Policy** provides that the "impairment of any employee by drugs or alcohol or the impermissible level of drugs or alcohol in the system of any employee

---

[1] The facts in this section are undisputed unless otherwise stated.
[2] Defs.' Statement of Undisputed & Disputed Material Facts ("SOF") Supp. Linton MSJ ¶ 32, ECF No. 90-3; Plfs.' Statement of Undisputed & Disputed Material Facts Supp. Opp. Defs.' Mots. Summ. J. ("SOF Opp. MSJ") ECF No. 120 ¶ 4.
[3] ECF No. 90-3 ¶ 15; ECF No. 120 ¶ 1.
[4] ECF No. 90-3 ¶ 15; ECF No. 120 ¶ 2; Defs.' SOF Supp. Lewis MSJ ¶ 15, ECF No. 92-3 (citing 2024 Exelon Corp. 10-K, Ex. A to Lewis MSJ, ECF No. 92-4 at 8).
[5] ECF No. 90-3 ¶ 17; ECF No. 120 ¶ 3.
[6] Code of Conduct, Ex. C to Richardson MSJ, ECF No. 91-6 at 15, 69.
[7] Code of Conduct, Ex. F to Calloway MSJ, ECF No. 93-9 at 12.

(i.e., a positive test result) while on duty, on Company property, or in Company vehicles is grounds for disciplinary action, up to and including immediate termination from employment."[8]

- **PECO's Drug and Alcohol Procedure** states that "[t]he use . . . or consumption of alcohol while on duty or on Company property is grounds for disciplinary action, up to and including immediate termination of employment."[9] Further, "[t]he impairment of any employee by drugs or alcohol or the impermissible level of drugs or alcohol in the system of any employee (i.e., a positive test result) while on duty or on Company property is grounds for disciplinary action, up to and including immediate termination of employment."[10] PECO's policy requires employees whose action or inaction may have contributed to an accident to be tested for drugs and alcohol as soon as practical.[11] PECO's policy requires immediate termination of an employee upon the second violation, but both PECO's and Exelon's policies permit termination for a single violation at Exelon's or PECO's discretion.[12]

- **Exelon's Use of Contractors Policy** ("Contractors Policy") governs a third-party contractor's ability to use former Exelon employees to perform services on Exelon projects or property.[13] PECO applies and conforms to the Contractors Policy.[14] Before December 1, 2023, the Contractors Policy prohibited former employees who were "terminated for cause or poor performance" from working on Exelon projects or property as a contractor for at least five years after their termination.[15] On December 1, 2023, the Contractors Policy was revised to apply to employees who were terminated for a specific list of disqualifying reasons, including theft, fraud, violence, discrimination or harassment, or violation of a lifesaving principle.[16] Under the revised Contractors Policy, former employees who were previously ineligible because they had been terminated for non-listed reasons became immediately eligible to work on Exelon systems or property.[17]

- **Exelon's Policy Against Sexual Harassment** ("Sexual Harassment Policy") prohibits supervisors from engaging in a romantic or sexual relationship with a subordinate employee.[18] Managers and supervisors "have an additional responsibility to lead by example and uphold

---

[8] Exelon Drug and Alcohol Policy, Ex. D to Richardson MSJ, ECF No. 91-7 at 4.

[9] PECO Drug and Alcohol Procedure at 2, Ex. M to Linton MSJ, ECF No. 90-16 at 3; PECO Drug and Alcohol Procedure, Ex. F to Richardson MSJ, ECF No. 91-9; PECO Drug & Alcohol Procedure, Ex. D to Calloway MSJ, ECF No. 93-7.

[10] ECF No. 90-16 at 3.

[11] ECF No. 91-9 at 6.

[12] ECF No. 91-9 at 3; ECF No. 91-7 at 4. PECO's Employee Standards of Conduct also permit termination where an employee shows up for work or is at work while under the influence of prohibited substances. PECO Employee Standards of Conduct at 9, Ex. G to Richardson MSJ, ECF No. 91-10 at 10.

[13] ECF No. 90-3 ¶ 18; M. Walker Decl. ¶ 9, Ex C to Linton MSJ, ECF No. 90-6; *see also* Jan. 1, 2020 Exelon Use of Contractors Policy, Ex. D to Linton MSJ, ECF No. 90-7.

[14] ECF No. 90-6 ¶ 9.

[15] *Id.* ¶¶ 13, 16–17.

[16] ECF No. 90-6 ¶¶ 20–21; *see also* Dec. 1, 2023 Exelon Use of Contractors Policy, Ex. E to Linton MSJ, ECF No. 90-8.

[17] ECF No. 90-6 ¶¶ 22, 26.

[18] Exelon Policy Against Sexual Harassment at 4, Ex. B to Lewis MSJ, ECF No. 92-5 at 5 ("When one person can determine or influence the terms, conditions and privileges of employment of another person, the two cannot be involved in a dating, romantic, or sexual relationship. Such relationships are a violation of this Policy.").

[Exelon's] values," and are "required to ensure that all employees are treated with respect and dignity in the workplace."[19] It further provides that "[i]ndividuals who violate this policy will be subject to disciplinary action, up to and including termination of employment."[20]

### A.    Plaintiff Warren Linton

Linton, a Black male, worked for PECO from February 27, 2017 until April 13, 2020.[21] He first worked as an apprentice, then as a lineman in PECO's underground department.[22] On February 28, 2020, Linton accepted a call to join a PECO crew on emergent work overnight.[23] Before accepting the call, Linton had consumed four to five alcoholic beverages.[24] During the shift, another employee cut an energized cable.[25] Following the accident, pursuant to PECO policy, the crew that was present submitted to drug and alcohol tests.[26] Linton's alcohol screening was performed approximately five hours after he had reported for work and showed a blood alcohol level of 0.054%.[27] PECO conducted an investigation and determined Linton was under the influence of alcohol while working, including while driving a PECO vehicle.[28] PECO terminated Linton's employment on April 13, 2020, for violations of the PECO Employee Standards of Conduct, PECO Drug & Alcohol Procedure, and the Exelon Code of Business Conduct.[29]

Linton's initial termination from PECO is not the basis for this lawsuit. In October 2021, Linton and his union IBEW Local 614 entered a settlement agreement with PECO in connection

---

[19] ECF No. 92-5 at 5.
[20] *Id.* at 9.
[21] ECF No. 90-3 ¶ 32; *see also* ECF No. 120 ¶ 6.
[22] ECF No. 90-3 ¶ 32.
[23] *Id.* ¶ 34.
[24] *Id.* ¶ 35; Linton Fact Finding, Ex. G to Linton MSJ, ECF No. 90-10 at 3.
[25] ECF No. 90-10 at 7.
[26] ECF No. 90-3 ¶ 59; *see also* PECO Drug & Alcohol Procedure, Ex. M to Linton MSJ, ECF No. 90-16; Linton Dep. 101:4-10, Ex. L to Linton MSJ, ECF No. 90-15 at 35.
[27] ECF No. 90-3 ¶¶ 40–44; Linton Termination Request Form, Ex. J to Linton MSJ, ECF No. 90-13; Management Referral Email, Ex. N to Linton MSJ, ECF No. 90-17.
[28] *See* Fact Finding – Warren Linton, Ex. G to Linton MSJ, ECF No. 90-10; Linton Termination Letter, Ex. I to Linton MSJ, ECF No. 90-12; Email from E. Avery to A. Rohrer-Kraemer, Mar. 2, 2020, Ex. N to Linton MSJ, ECF No. 90-17.
[29] ECF No. 90-12.

with a grievance filed under the collective bargaining agreement challenging the circumstances of his termination from PECO.[30] Linton agreed to release all claims that existed at that time arising out of his employment or termination of employment.[31] The settlement agreement also provided:

> In the event a third-party contractor hires Linton, whether he may work for that contractor on PECO or other Exelon entity projects or property shall be in the sole discretion of PECO or Exelon and shall not be subject to the grievance and arbitration procedure. The decision at any time to deny Linton the ability to work on PECO or Exelon projects or property shall not be deemed as a violation of this Agreement.[32]

Linton believed the settlement agreement allowed him to work on PECO property.[33] After his termination from PECO, Linton began working for Henkels & McCoy ("H&M").[34] Initially, he worked for H&M entirely on Pennsylvania Power & Light ("PPL") projects.[35] Then, H&M had a dispute with PPL, and its employees could no longer work on PPL property.[36] Thereafter, Linton began working for H&M on PECO property.[37]

In March 2023, Exelon conducted an audit of its contractors to identify any individuals working on Exelon property who had been terminated for cause ("the Audit").[38] The Audit identified seventeen former Exelon employees who had been terminated for cause or poor performance, five of whom were confirmed to be ineligible to work on Exelon systems or property.[39] Three of the five were white and two, including Linton, were minority males.[40] Of the seventeen former employees, Plaintiffs point to the four who had worked for PECO (as opposed

---

[30] Settlement Agreement, Ex. K to Linton MSJ, ECF No. 90-14.
[31] *Id.* at 3–4.
[32] *Id.* at 3.
[33] ECF No. 90-15 at 8.
[34] Linton Interrogatory Response No. 11, Ex. P to Linton MSJ, ECF No. 90-19 at 19; *see also* Linton 2023 W-2, Ex. O to Linton MSJ, ECF No. 90-18.
[35] ECF No. 90-15 at 8.
[36] *Id.* at 10–11.
[37] *See* Linton Exelon Internal Resume, Ex. F to Linton MSJ, ECF No. 90-9; ECF No. 120 ¶ 10.
[38] ECF No. 90-6 ¶ 28; Apr. 2023 Contractor DNR Audit Final Review at 5, ECF No. 90-20 at 6 & ECF No. 95 at 7.
[39] ECF No. 90-6 ¶¶ 29–30; ECF No. 95 at 7.
[40] ECF No. 90-6 ¶ 31; ECF No. 95 at 7.

to other Exelon subsidiaries) and notes that they all "were black or people of color."[41] However, three of those four were recommended to be allowed to work on Exelon systems.[42]

Linton identifies Scott Gaffney as a comparator who was treated more favorably.[43] Gaffney is a white contractor who was found to have been working on Exelon's system without HR approval but was allowed to continue to work on the system because he had a "Grievance Settlement."[44] Gaffney was formerly employed by ComEd and was discharged for poor performance on May 20, 2014.[45]

As a result of the Audit, Exelon informed H&M that Linton was ineligible to work on Exelon systems or property.[46] H&M thereafter told Linton he was ineligible to work on PECO's system and that he should take a few days off while they determined whether they had other projects Linton could work on.[47] In March 2023, H&M terminated Linton's employment because of his ineligibility to work on PECO's system.[48] Around May 2023, Linton began working for Infrasource, which is also a PECO contractor, but which has work not involving PECO property.[49]

Following the December 1, 2023 revisions to the Contractors Policy, Linton became eligible to work on Exelon systems and property because his employment was not terminated for one of the listed reasons in the revised policy.[50]

---

[41] ECF No. 120 ¶ 13; ECF No. 95 at 4 (showing 17 identified contractors, including 6 white males ("WM"), 6 minority males ("MM"), 2 white females ("WF"), 2 minority females ("MF"), and 1 unknown).
[42] ECF No. 95 at 7.
[43] ECF No. 120 ¶ 14.
[44] *Id.*; ECF No. 95 at 7.
[45] ECF No. 95 at 7.
[46] ECF No. 90-6 ¶ 33.
[47] ECF No. 90-15 at 10–12.
[48] *Id.* at 7; Linton Interrogatory Response No. 11, Ex. P to Linton MSJ, ECF No. 90-19 at 19.
[49] ECF No. 90-19 at 19–20.
[50] ECF No. 90-6 ¶ 35.

Linton filed two complaints related to the discrimination and retaliation asserted here. On March 29, 2023, Linton made a formal ethics complaint.[51] In September 2023, Linton filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC Charge"), asserting he was discriminated against because of his race when he was "kicked off PECO's system."[52]

Here, Linton asserts a single count of race discrimination and/or retaliation in violation of Title VII and Section 1981 based on his removal from PECO's system that led to his termination from H&M.[53]

### B.     Plaintiff Calvin Richardson

Richardson, also a Black male, worked for PECO from 1987 until his termination on November 17, 2020.[54] In 1997, when Richardson worked as a meter reader, he tested positive for cocaine on a routine random drug test.[55] Richardson believed this positive drug test was expunged from his disciplinary record in 1997, when PECO was taken over by Exelon.[56] According to Emilee Avery, the current Fitness for Duty Manager at PECO, there is no PECO policy providing for such expungement, and Defendants contend the positive drug test was not expunged.[57] Plaintiffs dispute whether Avery has personal knowledge of previous PECO or Exelon policies and contend that Defendants did not produce admissible evidence regarding the drug and alcohol

---

[51] ECF No. 120 ¶¶ 15–16; ECF No. 120-3 at 4–8; ECF No. 90-19 at 20.
[52] EEOC Charge, Ex. T to Linton MSJ, ECF No. 90-23.
[53] TAC ¶¶ 154–58, ECF No. 62.
[54] *See* Richardson Termination Letter, Ex. T to Richardson MSJ, ECF No. 91-23.
[55] Richardson Dep. 13:24-14:24, 7:14-21, 20:22-21:2, Ex. I to Richardson MSJ, ECF No 96-3 at 7.
[56] *Id.* at 8, 34.
[57] Avery Decl. ¶ 9, Ex. E to Richardson MSJ, ECF No. 96-2.

15

policies that were in effect in 1997.[58] Defendants produced Richardson's discipline record from November 17, 2020, which still reflected Richardson's positive test from 1997.[59]

In December 2005, Richardson's drivers' license was suspended for one year as a result of a DUI.[60] Part of Richardson's job with PECO required him to drive.[61] He was not fired as a result of losing his license, but he "went out on stress" for close to a year.[62] During that time, PECO provided Richardson with intensive outpatient treatment for alcohol abuse.[63] He relied on coworkers to drive him to and from work locations.[64] Based on this experience, Richardson was aware that under Exelon and PECO policies, he could inform PECO of any drug or alcohol issue he was having and proceed through the employee assistance program to receive any necessary treatment, without receiving discipline.[65]

In the fall of 2020, Richardson claims his daughter was promoted at TD Bank, and Richardson had a party to celebrate at his house, where his daughter lived with him.[66] This is directly contradicted by TD Bank's records, which show Richardson's daughter did not work at TD Bank in 2020.[67] Around 11:00 p.m. on the night of the party, Richardson ate a cookie that was on the kitchen island with the other food.[68] The next day, Richardson woke up around 5:00 a.m. to arrive at work around 7:00.[69] A few days later, Richardson learned the cookies had been laced with

---

[58] ECF No. 116 at 8.

[59] *See* Richardson Discipline Summary, Ex. U to Richardson MSJ, ECF No. 91-24; *see also* Richardson Consensus Form, Ex. V to Richardson MSJ, ECF No. 91-25.

[60] ECF No. 96-3 at 50–51.

[61] *Id.* at 51.

[62] *Id.* at 51–53.

[63] *Id.* at 52–54; *see also* Ex. M, SAP Initial Evaluation and Recommendation, Ex. M to Richardson MSJ, ECF No. 91-16.

[64] *See* ECF No. 96-3 at 61–62.

[65] *Id.* at 82.

[66] *Id.* at 24–25, 42.

[67] Ex. R, TD Bank Letter re Brianna Richardson, Ex. R to Richardson MSJ, ECF No. 91-21; TD Bank Job Data for Brianna Richardson, Ex. S to Richardson MSJ, ECF No. 91-22 (showing her TD Bank employment ended on December 21, 2013, and she was rehired on April 25, 2023).

[68] ECF No. 96-3 at 25–26, 31–32.

[69] *Id.* at 32.

THC.[70] Richardson knew at the time that under PECO's rules, he was not permitted to ingest THC or marijuana.[71] Richardson did not affirmatively report the incident to PECO.[72]

On August 30, 2020, Richardson was at a worksite overseeing an employee who was in training.[73] An accident occurred there, resulting in a local power outage.[74] Pursuant to PECO's policy, all PECO employees who were on site at the time of the accident were tested for drugs and alcohol, including Richardson.[75] Richardson tested positive for "marijuana (THC) metabolite."[76] Following the positive result, Richardson was relieved of duties without pay pending the outcome of an investigation.[77] The fact-finding investigation included an interview conducted by a PECO supervisor, foreman, and shop steward.[78] There, Richardson recounted ingesting THC at the party for his daughter and explained he did not know the cookies were laced.[79]

On November 17, 2020, PECO terminated Richardson's employment because he tested positive for drugs for a second time during his employment.[80]

About one month after his termination, Richardson was hired at Riggs Distler ("Riggs"), a PECO contractor.[81] Richardson was hired as a "small job foreman," earning $59 per hour.[82] All of the projects he worked on between December 2020 and October 2023 were on PECO's systems.[83]

---

[70] *Id.* at 25, 29–30.
[71] *Id.* at 38.
[72] *Id.* at 81–83.
[73] *Id.* at 21.
[74] *See id.* at 21–22; ACE Investigation Report, Ex. N to Richardson MSJ, ECF No. 91-17.
[75] ECF No. 96-3 at 20; ECF No. 91-9 at 6.
[76] Richardson Drug Test Results, Ex. O to Richardson MSJ, ECF No. 91-18.
[77] Suspension Letter, Ex. P to Richardson MSJ, ECF No. 91-19.
[78] *See* Richardson Fact Finding, Ex. Q to Richardson MSJ, ECF No. 91-20; *see also* ECF No. 96-3 at 44–46 (confirming in deposition testimony that he made those statements and they were accurate).
[79] ECF No. 91-20 at 3.
[80] *See* Richardson Termination Letter, Ex. T to Richardson MSJ, ECF No. 91-23; Richardson Discipline Summary, Ex. U to Richardson MSJ, ECF No. 91-24 (summarizing Richardson's previous positive test and applicable policies); Richardson Termination Consensus Form, Ex. V to Richardson MSJ, ECF No. 91-25 (recommending discipline in the form of termination based on "2nd failed [Fitness for Duty] test as per procedure").
[81] ECF No. 96-3 at 85.
[82] *Id.* at 85, 89.
[83] *Id.* at 89–90.

In October 2023, Richardson learned from Riggs that he was not permitted to work on PECO's system,[84] and he was laid off in November 2023.[85] In January 2024, after the Contractors Policy changed to allow former employees who had been terminated for non-enumerated reasons to work as contractors, Riggs rehired Richardson, and he has worked on PECO's system ever since.[86]

Here, Richardson asserts a single count of discrimination in violation of Title VII and Section 1981, based on Defendants' application of the Exelon Drug and Alcohol Policy and the Contractors Policy.[87]

In support of his claim, Richardson points to four purported comparators who are white—Len Sennelli, Tre Heptig, Bob Howie, and an unnamed person—and who he claims were granted lenience after testing positive for drugs or alcohol, but all his information is second- or third-hand.[88] Richardson has no direct knowledge of any of those individuals' circumstances.

Defendants submitted a declaration from PECO Fitness for Duty Manager Avery.[89] Avery would testify that Tre Heptig tested positive for THC one time; he is still employed by PECO.[90] Avery could not identify any current or former employee with the last name "Sennelli" with a recorded DUI or positive drug test.[91] Avery identified one former employee named Robert Howie, who retired in 1998.[92] She found no records indicating Howie failed a drug or alcohol test, disclosed a drug or alcohol problem, or violated any drug or alcohol policy during his employment.[93] Avery also prepared a chart, based on PECO's personnel records, showing the

---

[84] *Id.* at 93–94.
[85] Richardson Riggs Distler Employee History, Ex. W to Richardson MSJ, ECF No. 91-26.
[86] ECF No. 96-3 at 95.
[87] ECF No. 62 ¶¶ 149–53.
[88] *See* ECF No. 96-3 at 61–62, 67–68, 70–78, 84.
[89] ECF No. 96-2.
[90] *Id.* ¶¶ 19–21.
[91] *Id.* ¶ 22.
[92] *Id.* ¶ 23.
[93] *Id.* ¶ 25.

sixteen individuals other than Richardson who were terminated, resigned in lieu of termination, or retired in lieu of termination after a second positive drug test even though their first positive test occurred before the year 2000.[94] Of those sixteen employees, fourteen are white.[95] Of the two employees who are African American, one retired and the other was terminated.[96]

### C.    Plaintiff Lawrence Calloway

Calloway is a Black male who worked for PECO from 2004 until October 21, 2022.[97] At the time of his termination, he was a foreman in PECO's underground department and supervised employees who were responsible for servicing underground electrical lines.[98]

Over the course of his employment, Calloway complained of race-based discrimination several times, including a July 2020 email to PECO's and Exelon's CEOs; a July 23, 2020 Ethics complaint; an undocumented February 2021 report to his supervisor, PECO Human Resources, and Ethics; a June 2020 incident where Calloway "voiced concerns about discrimination against himself and other Black employees to his entire management chain"; and a June 2021 text to a colleague.[99]

On September 27, 2022, Calloway was assisting workers with PECO contractor H&M when a safety incident occurred.[100] Calloway was required to complete a post-accident drug and alcohol screening, which returned positive results for codeine with a concentration of 2,879 ng/ml, 879 ng/ml above the 2,000 ng/ml screening threshold.[101]

---

[94] ECF No. 96-2 ¶¶ 15–16; *see also* ECF No. 96-4.
[95] ECF No. 96-2 ¶ 17; *see also* ECF No. 96-4.
[96] ECF No. 96-4 at 4.
[97] ECF No. 120 ¶ 25; Walker Decl. ¶ 8, Ex. G to Calloway MSJ, ECF No. 98-2.
[98] ECF No. 98-2 ¶¶ 8–9.
[99] ECF No. 62 ¶¶ 56–58; Calloway Email to Calvin Butler, Ex. V to Calloway MSJ, ECF No. 93-25; ECF No. 98-4 at 2424-245:10, 225:2-230:6, 245:16-246:8; Discrimination Reports, Ex. W to Calloway MSJ, ECF No. 93-26; 07.01.2021 Text Exchange, Ex. X to Calloway MSJ, ECF No. 93-27.
[100] Apparent Cause Evaluation Investigation Report, Ex. J to Calloway MSJ, ECF No. 93-13.
[101] *See* ECF No. 93-7; Calloway Drug Screening Report, Ex. K to Calloway MSJ, ECF No. 93-14.

On October 6, 2022, Calloway emailed Fitness for Duty Manager Avery to appeal the positive drug test result.[102] In his email, he claimed the positive result for codeine was due to "an abundan[t] consumption of poppyseeds" from consuming salad dressing and bagels.[103] Avery investigated Calloway's claim and confirmed the positive result with a third-party medical review officer ("MRO"), who explained that the threshold for opiates (including codeine and morphine) is raised to 2,000 ng/ml to avoid the possibility of false positive results based on poppyseed consumption.[104] Avery also learned from the MRO that poppyseeds meant for consumption are typically washed and cooked, which removes most opiates and makes it unlikely to trigger a positive drug test for opiates, and she learned that if the poppyseeds were the cause of the positive test for codeine, Calloway would also likely have tested positive for other opiates like morphine, which he did not.[105] Based on information shared by the MRO, Avery concluded Calloway's claim was an implausible explanation for his positive test result.[106] On October 14, 2022, Avery conveyed her conclusion and reasoning to Calloway.[107]

In the following fact-finding investigation, Calloway continued to assert the positive results were caused by poppyseed consumption.[108] PECO found that explanation to be highly implausible and that "Mr. Calloway's failure to admit his actions are in direct violation of the expectations set out in the Code of Business Conduct."[109] According to Mary Walker, then-Vice President of Human Resources, PECO determined that Calloway was being untruthful in the post-test

---

[102] *See* Calloway Drug Test Appeal, Ex. M to Calloway MSJ, ECF No. 93-16; Avery Decl., Ex. L to Calloway MSJ, ECF No. 98-3.

[103] ECF No. 96-13.

[104] Appeal Response Letter, Ex. N to Calloway MSJ, ECF No. 93-17; 11.6.2022 Email from G. Phillips to E. Avery, Ex. O to Calloway MSJ, ECF No. 93-18.

[105] ECF No. 98-3 ¶¶ 20–21; ECF No. 93-19.

[106] ECF No. 98-3 ¶ 22.

[107] ECF No. 93-17.

[108] Fact Finding – Lawrence Calloway, Ex. Q to Calloway MSJ, ECF No. 93-20.

[109] PECO Consensus Form, Ex. Q to Calloway MSJ, ECF No. 93-21 at 3.

investigation.[110] Additionally, because Calloway was an FMSCA Medical Certificate holder, he had an obligation to notify PECO if he was taking any substance that would impair his ability to do his job; PECO determined his failure to do so violated PECO policies and procedures.[111] According to Walker, Calloway was terminated on October 21, 2022, due to his failure to participate honestly in the investigation into his positive drug test result.[112]

The following month, Calloway began working for Infrasource, a PECO contractor, where he remains employed today.[113] Calloway testified at his deposition that he had to start at Infrasource as an underground splicer because he "didn't really know, exactly, his parameters on working on PECO's system" after he was terminated.[114] Calloway was promoted to foreman in February or March 2025.[115] He still works for Infrasource on PECO's system, and Defendants have not sought his removal from working on their systems.[116]

Calloway brought this lawsuit, asserting a single count of discrimination and/or retaliation, based on Defendants' application of the Exelon Drug and Alcohol Policy and Contractors Policy.[117] Specifically, Calloway challenges Defendants requiring him to undergo a post-accident drug and alcohol test when he was not involved in an accident, terminating his employment with PECO for his first positive drug test, and prohibiting him from working on Exelon property as a contractor.[118]

---

[110] Walker Decl. ¶¶ 13–17, Ex. G to Calloway MSJ, ECF No. 98-2.
[111] ECF No. 93-21 at 3.
[112] ECF No. 98-2 ¶ 17.
[113] Calloway Dep. Tr., Ex. T to Calloway MSJ, ECF No. 98-4 at 6, 8; Infrasource Employee Information Card, Ex. U to Calloway MSJ, ECF No. 93-24.
[114] ECF No. 98-4 at 11, 12–13.
[115] Id. at 6–7.
[116] Id. at 8, 13–14.
[117] ECF No. 62 ¶¶ 144–48.
[118] Id. ¶ 146.

### D.    Plaintiff Garry Lewis

Garry Lewis is a Black male who was hired by EBSC in January 2023 as a supervisor in the Exelon Security Operations Center ("ESOC").[119] Lewis received training on Exelon's Policy Against Sexual Harassment, read the policy, and understood that, as a supervisor, it was his obligation, not only to adhere to the policy, but also to enforce the policy.[120] In his position, Lewis was responsible for protecting the company and making sure that he limited the company's exposure to risk and harm to employees.[121] At his deposition, Lewis agreed that having sex, even once, with a subordinate employee actually increases the exposure for the company.[122]

Lewis alleges his supervisor Steve Shipp "made racial comments" frequently during Lewis's employment.[123] For example, in August 2023, while at a training where they were outdoors in a field with no available restrooms, Lewis told Shipp he needed to use the restroom.[124] Shipp directed him to use a nearby wooded area but, noting there were cameras, he warned Lewis "you wouldn't want to do that, and then let ESOC see your big, black dick on a screen."[125] On another occasion, Shipp commented on Lewis's shaved head, which Lewis interpreted as being related to his race because Shipp had previously made inappropriate comments about Black hairstyles.[126] On another occasion, Shipp questioned why "[B]lack females can never get along in the work environment" and commented that Black women have attitudes.[127] He also referred to a Black female employee who had been terminated as "ratchet" and said "basically how he was

---

[119] ECF No. 62 ¶ 126; Lewis Dep., Ex. C to Lewis MSJ, ECF No. 97 at 6.
[120] Lewis Dep. Tr., Ex. C to Lewis MSJ, ECF No. 97 at 18; Amin Decl. ¶ 15, Ex. E to Lewis MSJ, ECF No. 92-8.
[121] ECF No. 97 at 14–15.
[122] *Id.* at 14–15.
[123] *Id.* at 72–73.
[124] *Id.* at 91.
[125] *Id.* at 91–92; Cellphone Notes, Ex. K to Lewis MSJ, ECF No. 92-14 at 2.
[126] ECF No. 97 at 76–79, 88.
[127] *Id.* at 85–86; ECF No. 92-14.

happy to get rid of her."[128] In September 2023, Shipp commented that it made sense that a coworker owned a Dunkin Donuts because the coworker was from India.[129] In March 2024, Shipp stated that "Asians are robotic" and made a comment about "[B]lack women and their attitudes."[130] On another occasion, in response to Lewis explaining an encounter he had with Maryland State Police when he was armed, Shipp "used the term 'Mexican holster' when referring to a side arm being held on a person's front hip,'" which Lewis interpreted as Shipp saying "you're carrying a weapon as a criminal."[131] Lewis maintained, however, that if a "Mexican holster" was a real thing, it would not be a racist comment.[132] Lewis did not report Shipp's comments to Human Resources or Exelon's leadership because he "didn't trust the system there."[133]

On April 23, 2024, Lewis met with a female employee whom he supervised outside of work at a restaurant, went back to her apartment with her, and had sex with her.[134] One of the employee's coworkers learned of the encounter and notified a different supervisor in the ESOC, and an investigation ensued.[135] During the investigation, Lewis admitted that he and the employee met at a restaurant, he went to her apartment, and they had sex.[136] Exelon found that Lewis's conduct in having sex with an employee he supervised violated Exelon's policy.[137]

Director of Physical Security Michael Melvin recommended to Senior Vice President of Security Operations Isaac Akridge that Lewis's employment be terminated, and Akridge agreed.[138]

---

[128] ECF No. 97 at 87.
[129] *Id.* at 97–98; Cellphone Notes, Ex. J to Lewis MSJ, ECF No. 92-13.
[130] ECF No. 97 at 104–06; ECF No. 92-13.
[131] ECF No. 97 at 113–15.
[132] *Id.*
[133] *Id.* at 97–101, 112; ECF No. 92-8 ¶ 22.
[134] ECF No. 97 at 9–10.
[135] Termination Request Form, Ex. F to Lewis MSJ, ECF No. 92-9.
[136] ECF No. 97 at 10–11; Interview Notes, Ex. G to Lewis MSJ, ECF No. 97-1.
[137] Termination Letter, Ex. I to Lewis MSJ, ECF No. 92-12 at 4; *see also* Melvin Decl. ¶¶ 11–12, Ex. H to Lewis MSJ, ECF No. 92-11.
[138] ECF No. 92-11 ¶ 13.

On May 24, 2024, Exelon terminated Lewis for his conduct, which violated the Code of Conduct and Sexual Harassment Policy.[139] Shipp was not involved in the termination decision.[140]

Lewis understands he was terminated because of his sexual encounter with the female employee he supervised, but he believes the Sexual Harassment Policy applies only to sexual relationships which constitute "a course of continuing action," not a one-time "sexual encounter."[141] Lewis believes the Sexual Harassment Policy is applied in a racially discriminatory manner. His claim that it is applied differently to white and non-white employees is based on "grapevine information" and "enterprise gossip."[142]

After his termination, Lewis sought employment with PDR Elite ("PDR"), where he would provide physical security for the people working on Exelon's system and for BGE's equipment, which was kept off-site (not on BGE property).[143] Lewis understood the Contractors Policy as prohibiting him from working for any contractor who contracts with Exelon, regardless of whether he worked "on the system," on an Exelon project, or on Exelon property.[144] Lewis told PDR's owner Clive Rawlins that he was not allowed to work for any Exelon subcontractor.[145] Rawlins then told Lewis he could not hire him because of his "ban."[146] Lewis contacted Exelon to better understand the applicability of the Contractors Policy to him.[147] Exelon provided the language of the policy and confirmed he was "not permitted to work on an Exelon property or projects."[148] Lewis did not specifically inquire as to whether the Contractors Policy would prohibit his work

---

[139] Amin Decl. ¶¶ 19–20, Ex. P to Lewis MSJ, ECF No. 92-8; ECF No. 92-11 ¶12; Termination Letter, Ex. I to Lewis MSJ, ECF No. 92-12.
[140] ECF No. 92-11 ¶ 15.
[141] ECF No. 97 at 11–12, 20.
[142] *Id.* at 25–26.
[143] *Id.* at 45–49; *see also* ECF No. 62 ¶ 143.
[144] *Id.* at 46–47.
[145] *Id.* at 51–52, 53.
[146] *Id.* at 50.
[147] Emails Between G. Lewis and D. Ortel, Ex. K to Pls.' Opp., ECF No. 120-12 at 3.
[148] *Id.*

24

for PDR or a company that contracts with Exelon if that work did not involve Exelon property or projects, nor is there evidence that Rawlins or any other possible employer contacted Exelon about employing Lewis.[149]

Lewis asserts a single count of harassment and race discrimination based on Defendants' application of the Sexual Harassment Policy and Code of Conduct.[150]

## IV.     Defendants' Motion to Strike the Opposition

Defendants move to strike Plaintiffs' Opposition in its entirety, or in the alternative, to strike the email correspondence between counsel (Ex. C to Pls.' Opp., ECF Nos. 119-4, 120-4) and the Declaration of Tonya Baña (Ex. N to Pls.' Opp., ECF No. 119-15, 120-15), as well as any mention of those exhibits in Plaintiffs' Opposition. ECF No. 122; *see also* Sealed Mem. L. Supp. Mot. Strike, ECF No. 128. Plaintiffs opposed the motion to strike on April 6, 2026. ECF No. 133. Because the Court has allowed Plaintiffs' motion for leave to file out-of-time, it does not separately address Defendants' motion to strike the Opposition based on untimeliness. The Court will not strike the Opposition in its entirety. However, the Court will address the parties' arguments with respect to the settlement communications and the declaration from Plaintiffs' Counsel.

### A.     Confidential Settlement Communications

Plaintiffs submitted Exhibit C, email communications about settling Linton's claims, in support of Linton's retaliation claim. *See* ECF No. 120-4. In essence, Plaintiffs argue that Defendants retaliated against Linton by refusing to allow him to return to work on PECO systems unless he signed a release of claims. *Id.*[151] In other words, Plaintiffs argue the proposed settlement

---

[149] ECF No. 97 at 50–52; *see also* ECF No. 92-8 ¶¶ 25–26.

[150] ECF No. 62 ¶¶ 159–63; Walker Decl. ¶ 8, Ex. G to Calloway MSJ, ECF No. 93-10.

[151] *See also* ECF No. 116 at 15 ("[O]bjective evidence directly refutes Defendants' position [that Linton's retaliation claims fail as a matter of law]. Linton's contemporaneous communications with Defendants challenging his removal from PECO's system conclusively prove that (1) on March 29, 2023 Linton made a formal complaint to Exelon's Ethics asserting that former PECO employees who are black were kicked off PECO's system while similarly situated white former PECO employees were not kicked off the system; and (2) on June 1, 2023 Defendants' [sic] informed

term itself was a retaliatory act. The Court will deny Defendants' motion to strike Exhibit C to the Opposition because Plaintiffs present the settlement communications as an independent basis for Linton's retaliation claims.

Summary judgment must be defeated by evidence which will be admissible at trial. *Liptok v. Bank of Am.*, No. 3:15-CV-156, 2016 WL 6818362, at \*12 (M.D. Pa. Oct. 20, 2016), *report and recommendation adopted*, 2016 WL 6780757 (M.D. Pa. Nov. 16, 2016), *aff'd*, 773 F. App'x 97 (3d Cir. 2019). Federal Rule of Evidence 408 prohibits a party from using settlement communications to prove liability. Fed. R. Evid. 408(a). Courts "may not consider settlement offers or settlement documents on the issue of liability or damages." *Lamb v. CVS Pharmacy LLC*, 704 F. Supp. 3d 606, 610 (E.D. Pa. 2023). However, settlement communications are admissible when the evidence is offered for another purpose. Fed. R. Evid. 408(b). "In particular, such correspondence can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination)." *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998); *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1294 (6th Cir. 1997) ("Rule 408 does not exclude evidence of alleged threats to retaliate for protected activity when the statements occurred during negotiations focused on the protected activity and the evidence serves to prove liability either for making, or later acting upon, the threats."); *Harris v. Midas*, No. 17-95, 2017 WL 3440693, at \*5 (W.D. Pa. Aug. 10, 2017) (finding settlement letter admissible to prove retaliation claim because plaintiffs did not rely on letter to prove liability for claims pre-dating the communication but not reaching question of whether settlement letter alone gave rise to independent retaliation claim).

---

Linton that he would not be allowed to continue working on PECO's system unless he signed a settlement agreement releasing his discrimination claims arising from his removal from the system.").

Here, Linton offers the settlement communications, not to prove liability on his discrimination claims, but as an independent basis for his retaliation claims. He argues that after he engaged in protected activity, Defendants retaliated against him by requiring him to release his claims before they would allow him to work on PECO's systems. The communications would be admissible for the purpose of establishing that distinct retaliatory act.

### B.    Declaration of Counsel

Rather than submit declarations or deposition testimony from witnesses, Plaintiffs submitted a declaration from their counsel identifying four witnesses they intend to call at trial. In fact, Plaintiffs did not depose a single witness during discovery. *See* ECF No. 129 at 9. In lieu of any actual witness testimony, Plaintiffs' Counsel asserts, "on information and belief," four witnesses would "testify to certain facts regarding comparators to Plaintiff Garry Lewis." ECF No. 120-15. Defendants primarily argue Plaintiffs' Counsel lacks personal knowledge and would, therefore, not be competent to testify to the matters stated in the declaration. ECF No. 128 at 12–14. Plaintiffs do not argue otherwise. In their opposition, they simply argue (without citing any legal authority) that none of the witnesses listed are a surprise to Defendants, that Defendants improperly withheld information during discovery, and that one of the witnesses is now willing to provide a declaration directly. ECF No. 133 at 7–8. The Court agrees with Defendants and will strike Exhibit N to the Opposition.

Federal Rule of Civil Procedure 56(c)(4) provides that declarations used to oppose summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (holding a purported expert report, not sworn to by the expert but attached to an affidavit of counsel stating it was a "true copy," was "not competent to be considered on a motion for summary judgment");

*see also Slater v. Susquehanna Cnty.*, 613 F. Supp. 2d 653, 665–66 (M.D. Pa. 2009) (declining to consider affidavit of nonmovant attorney because attorney lacked personal knowledge of the facts therein), *aff'd*, 465 F. App'x 132 (3d Cir. 2012). "A third party's description of [a witness's] supposed testimony is not suitable grist for the summary judgment mill." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (declining to consider interrogatory answer, which was plaintiffs' "account of what they think (or hope)" expert testimony might be and finding it was inadmissible hearsay). Such a statement is inadmissible hearsay. *Id.*; *see also Krouse v. Am. Sterilizer Co.*, 984 F. Supp. 891, 914 n.19 (W.D. Pa. 1996) (finding declarants of statements attached to plaintiff's affidavit were not acting on behalf of defendant or in natural course of their duties as agents of defendant such that statements would be admissible as party opponent statements under Fed. R. Evid. 801(d)(2)(D)).

Here, Plaintiffs' Counsel does not have personal knowledge of the witness's proffered testimony, nor is she competent to testify on the matters stated in her affidavit. She proffers testimony she anticipates will be elicited at trial from four witnesses, but those proffers are made "upon information and belief," not personal knowledge. Additionally, if the testimony were to come from Plaintiffs' Counsel, it would be inadmissible hearsay, which cannot be considered at summary judgment. Because the affidavit does not comply with Rule 56(c)(4), Defendants' motion to strike Exhibit N and any portions of the Opposition that rely upon it is granted.

## V.      Defendants' Declarations Are Properly Before the Court.

As a preliminary matter, Plaintiffs argue the Court should strike or disregard the declarations of PECO Vice President of Human Resources Mary Walker, PECO Fitness for Duty Manager Emilee Avery, and Senior Human Resources Manager Payal Amin because they are "inaccurate and materially incomplete declarations from interested defense witnesses" and the

documents they discussed are the best evidence of the contents therein. Plaintiffs also raise hearsay and improper opinion objections.

Rule 56 permits consideration of declarations in support of a summary judgment motion where they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). It is of no moment whether the declaration comes from an interested witness, so long as the testimony is uncontradicted and not inherently implausible. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007).

The need for personal knowledge is governed by Rule 602 of the Federal Rules of Evidence. Rule 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. "Although first-hand observation is the most common form of personal knowledge, first-hand observation is not the only basis for personal knowledge." *L.A. Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006). With respect to the testimony of employees within an organization, they can testify as to the implementation and application of policies based on their experience, including "practices or procedures in place before the witness was employed with the organization about which he is relating the information." *Id.* (citing *United States v. Thompson*, 559 F.2d 552, 554 (9th Cir. 1977)). Courts may look to the declarant's job title and responsibilities to determine whether the matters attested to are within their "sphere of knowledge." *See Elkin Valley Baptist Church v. PNC Bank, N.A.*, 748 F. Supp. 3d 293, 339 (W.D. Pa. 2024) ("[T]he sphere of an affiant's knowledge may be established by descriptions of the affiant's job title and responsibilities."); *Herbert v. Pouya*, No. 2:20-CV-1413, 2021 WL 1737463,

at *4 (W.D. Pa. May 3, 2021) ("[I]t is enough that the matters attested to would, in fact, be within the sphere of [the declarant's] own knowledge.").

The Best Evidence Rule provides that, when a party seeks to prove the contents of a document, the written document itself is required to do so. Fed. R. Evid. 1002. The rule does not "apply to testimony that books or records have been examined and found not to contain any reference to a designated matter." Fed. R. Evid. 1002 advisory committee's notes. Nor does it prohibit a witness from introducing a document and discussing how the policy therein came to be or how it is applied in practice. *See United States v. Miller*, No. 04-382, 2005 WL 3557831, at *2–3 (E.D. Pa. Dec. 29, 2005) (permitting testimony "based upon [employee's] personal knowledge and experience with the policies and procedures in place"). "[A]ny witness with knowledge of facts that exist independent of the contents of a writing, recording, or photograph may testify without raising an issue under Rule 1002." *Id.* at *2 (alteration in original) (quoting 31 Wright and Miller, *Federal Practice and Procedure* § 7184 (2000)).

### Declarations of Mary Walker

Defendants provided a declaration from Mary Walker, PECO's Vice President of Human Resources Operations, in support of each Plaintiff's summary judgment motion.[152] Ex. C to Linton MSJ, ECF No. 90-6; Ex. M to Lewis MSJ, ECF No. 92-16; Ex. H to Richardson MSJ, ECF No. 91-11; Ex. G to Calloway MSJ, ECF No. 98-2. Walker has worked in human resources for Exelon since 2016. ECF No. 90-6 ¶¶ 3–6; ECF No. 98-2 ¶¶ 3–6. In her role, she is personally familiar with the Contractors Policy, both in substance and application. ECF No. 90-6 ¶ 8; ECF No. 98-2 ¶ 19. If called as a witness, Walker would testify that the Contractors Policy applied to former employees who were terminated for cause or poor performance before December 1, 2023, and to former

---

[152] Defendants identified Walker as a 30(b)(6) witness, but Plaintiffs elected not to depose her (or any other witness). *See* ECF No. 129-1 at 4 n.1.

employees terminated for certain enumerated reasons after December 1, 2023, and to how the policy was applied in practice. ECF No. 90-6 ¶¶ 17, 20; ECF No. 98-2 ¶¶ 24–25, 28. She would further testify as to the reasons behind the policy change. ECF No. 90-6 ¶¶ 15, 23–25. Her testimony with respect to the policy documents would be supported by the written policies themselves, which Defendants attached to their motions. *See* ECF Nos. 90-7, 90-8, 93-11, 93-12. The applicability of the Contractors Policy and its development is within her sphere of knowledge as the Vice President of Human Resources. *See Herbert*, 2021 WL 1737463 at *4; *Elkin Valley Baptist Church*, 748 F. Supp. 3d at 339. Her proposed testimony also does not violate the Best Evidence Rule. She may testify as to how the policy evolved over time and how it was applied in practice based on her personal experience. *See Miller*, 2005 WL 3557831 at *2–3.

Finally, with respect to her proposed testimony about the investigation leading to Calloway's termination, she is competent to testify to those events because she was personally involved. Walker attended a Consensus Call to discuss Calloway's positive drug test result and his explanation and to decide on next steps. ECF No. 98-2 ¶ 12. Walker would testify as to the reasons for Calloway's termination—namely, that PECO determined Calloway did not participate honestly in the investigation. *Id.* ¶¶ 13–16. This is based on her personal knowledge.[153] Walker's declaration is properly before this Court.

### Declarations of Emilee Avery

Defendants submitted declarations from Emilee Avery, PECO's Fitness for Duty Manager, in support of the Richardson MSJ and Calloway MSJ. Ex. E to Richardson MSJ, ECF No. 96-2; Ex. L to Calloway MSJ, ECF No. 98-3. Avery served in that role during the investigation into

---

[153] The Court also does not rely solely on Walker's proposed testimony about Calloway's termination because Defendants have submitted other record evidence showing PECO terminated his employment in part because they found he was dishonest in the investigation into his positive drug test. *See, e.g.*, ECF No. 93-21 at 3.

Richardson's second positive drug test. ECF No. 96-2 ¶ 3. Plaintiffs' challenge to Avery's declaration is based on an alleged lack of personal knowledge and improper opinion.

With respect to Richardson, Avery would testify about information found regarding certain alleged comparators, including the absence of any records indicating two of the three never had a positive drug or alcohol test. ECF No. 96-2 ¶¶ 19–25. With respect to Calloway, Avery personally participated in the investigation into his positive drug test, ECF No. 98-3 ¶¶ 12, 16–26. In her role, she is personally familiar with PECO's and Exelon's drug and alcohol policies and personally participates in investigations related to violations of those policies. ECF No. 96-2 ¶ 6. Like Walker, Avery has established personal knowledge of those policies. *See Herbert*, 2021 WL 1737463 at *4; *Elkin Valley Baptist Church*, 748 F. Supp. 3d at 339.

Plaintiffs' objections to Avery's ability to testify to policies pre-dating her employment are unfounded. Avery's declaration indicates she is personally familiar with the policies, including those predating her employment. ECF No. 96-2 ¶ 6. The fact that she was not employed by PECO in 1997, when Richardson believes his disciplinary record was expunged, does not preclude her from testifying that "there is no mechanism in the Exelon Drug & Alcohol Policy, the PECO Drug & Alcohol Procedure, or any other policy, for the expungement of any prior positive drug tests." *See L.A. Times Commc'ns*, 442 F. Supp. 2d at 885; *see also* Fed. R. Evid. 1002 advisory committee's notes (explaining the Best Evidence Rule does not prohibit testimony as to the absence of "reference to a designated matter").

Furthermore, Avery's declaration in support of the Calloway MSJ does not contain improper opinions or "argumentative conclusions related to [Calloway's] credibility." ECF No. 116 at 8–9. Avery's declaration refers to information about poppyseeds and possible corresponding opiate levels that she learned and/or confirmed while investigating Calloway's appeal. *See* ECF

No. 98-3 ¶¶ 18–26. Based on that information, PECO determined Calloway's excuse for the positive drug test—that he ingested poppyseeds, not opiates—was implausible. Therefore, Defendants do not submit Avery's declaration to provide an opinion as to whether Calloway's test results could have been caused by poppyseeds, but rather to show the information PECO had that led it to conclude Calloway was being untruthful. Those statements would be admissible for that purpose.

### Declaration of Payal Amin

Finally, Defendants provided a declaration from Payal Amin, Exelon's Senior Manager of Human Resources, in support of the Lewis MSJ. ECF No. 92-8. Plaintiffs challenge the declaration as improperly seeking to establish the contents and history of the Sexual Harassment Policy. ECF No. 116 at 4. Plaintiffs do not develop this argument further; however, just like with Avery's and Walker's declarations, Amin's declaration establishes personal familiarity with the Sexual Harassment Policy, and Amin's testimony on how that policy is applied in practice would not be improper. *See Miller*, 2005 WL 3557831 at *2–3.

## VI.    Plaintiffs' Argument that they Are Entitled to Summary Judgment Is Improper.

Plaintiffs frame the majority of their arguments in opposition to Defendants' motions as an affirmative request that the Court grant summary judgment in their favor, as opposed to identifying record evidence establishing a genuine dispute of material fact or otherwise arguing Defendants are not entitled to judgment as a matter of law. If Plaintiffs wanted to move for summary judgment, they should have done so by January 14, 2026. ECF No. 74. They cannot belatedly move for summary judgment in an opposition brief. *See, e.g.*, *In re WorldClass Processing, Inc.*, 346 B.R. 132, 135 n.5 (Bankr. W.D. Pa. 2006) ("[A] request for relief included in a brief or responsive pleading is not permitted."); *Percella v. City of Bayonne*, No. 14-3695, 2021 WL 926613, at *4–7 (D.N.J. Mar. 10, 2021) (declining to consider a cross-motion not properly filed under Rule 56 or

33

local rules), *aff'd*, 2022 WL 2207832 (3d Cir. June 21, 2022). Therefore, the Court interprets their arguments as opposing Defendants' motions and does not consider whether Plaintiffs would be independently entitled to summary judgment.

### VII.      Summary Judgment Standard

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). A dispute as to those facts "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). A party asserting a fact is genuinely disputed must support their contention by citing to particular materials in the record. Fed. R. Civ. P. 56(c). The nonmoving party cannot rely on his pleadings alone to defeat summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves*, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." (emphasis added)).

### VIII.      Discrimination Claims

Title VII makes it unlawful "for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). Liability for employment discrimination based on race under § 1981 may be analyzed under the

same standard as race discrimination claims under Title VII. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010).

Under each of these statutes, claims based on circumstantial evidence of discrimination are governed by the *McDonnell Douglas* burden shifting framework. *Id.* at 267–68. Under this framework, a plaintiff must first establish a prima facie case of discrimination. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006); *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff makes out a prima facie case, the burden shifts to the defendants to establish a legitimate, nondiscriminatory reason for the unfavorable treatment. *Anderson*, 621 F.3d at 271. If the defendant provides such a reason, the burden shifts back to the plaintiff to show the defendant's proffered reason is merely a pretext for discrimination. *Id.* The *McDonnell Douglas* framework also applies to § 1981 claims, which require evidence of intentional discrimination. *See id.* at 268 ("The burden of a § 1981 plaintiff is to 'prove purposeful discrimination,' and the *McDonnell Douglas* framework assists in this endeavor by structuring the evidence on the issue of 'whether the defendant intentionally discriminated against the plaintiff.'").

To make out a prima facie case of discrimination under Title VII, the plaintiff must prove (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) he suffered that adverse action under circumstances giving rise to an inference of discrimination. *Oliver v. Clinical Practices of Univ. of Pa.*, 921 F. Supp. 2d 434, 447 (E.D. Pa. 2013). Similarly, to make out a prima facie § 1981 case, a plaintiff must prove intentional discrimination by the defendant. *Pryor v. NCAA*, 288 F.3d 548, 569 (3d Cir. 2002); *see also Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006). Discrimination may

35

be established with evidence that the employer treated some people not in the protected class more favorably than the plaintiff. *See Sarullo*, 352 F.3d at 798; *see also Scheidemantle*, 470 F.3d at 539.

### A.     Post-Termination Discrimination

Plaintiffs each raise a claim of discrimination based on the effects of the Contractor's Policy on their employment opportunities after their employment with Defendants was terminated. They concede that the Contractor's Policy is facially neutral but argue it is applied in a discriminatory manner. Even assuming Plaintiffs had established discriminatory application of the Contractor's Policy, their post-termination Title VII claims fail because Defendants did not act as Plaintiffs' "employers" with respect to any of the post-termination decisions made by third-party employers.

Title VII makes it unlawful for *an employer* to discriminate against any individual because of their race. 42 U.S.C. § 2000e-2(a). "In order to state a Title VII claim, [the plaintiff] must allege an employment relationship with the defendants." *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 119 (3d Cir. 2013). To determine whether an employment relationship exists, courts apply the factors set forth in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992), which focus on "the level of control the defendants exerted over the plaintiff." *Covington*, 710 F.3d at 119 (cleaned up). Courts "should concentrate on three indicia of control: (1) which entity paid plaintiff; (2) who hired and fired plaintiff; and (3) who controlled plaintiff's daily employment activities." *Crenshaw v. Diamond State Port Corp.*, 201 F. Supp. 3d 473, 481 (D. Del. 2016) (citing *Covington*, 710 F.3d at 119).

Courts also consider:

the hiring party's right to control the manner and means by which the product is accomplished [;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the

method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24.

In *Covington*, the Third Circuit found that a school district and state athletic association were employers for the purpose of a referee's Title VII claim. 710 F.3d at 119. They selected the time, date, and location of games, chose which officials worked each game, and paid the officials for their work during the games. *Id.* By contrast, in *Crenshaw*, the plaintiff had worked for the owner of the Port of Wilmington, which banned her from the property after an incident with a harbor patrol officer. 201 F. Supp. 3d at 477. The plaintiff later gained employment with a third-party company located at the Port. *Id.* When the defendant learned she was working on the property in violation of the ban, its harbor patrol officers removed her from the property. *Id.* Her new third-party employer terminated her employment as a result. *Id. Crenshaw* ultimately found each of the three *Darden* factors supported the conclusion that the plaintiff was not employed by the defendant—the plaintiff was hired by the third-party, there was no evidence that the defendant made the decision to terminate her, and the third-party had control over the plaintiff's daily employment activities. *Id.* at 481. The court recognized that the defendant's ban on the plaintiff's presence on its property "certainly had some impact" on the third-party employer's decision to fire her. *Id.* However, the court found that "some impact" was not enough where there was "no evidence that the decision to terminate her was made by anyone other than" the third-party. *Id.* The same is true here.

**H&M Was Linton's Employer in 2023, Not Defendants.**

It is undisputed that Linton was hired by H&M, that he was working for H&M at the time he was removed from PECO's system, and that he was terminated by H&M. His 2023 W-2

37

identifies H&M as his employer and shows he was paid by H&M and that H&M paid his taxes. ECF No. 90-18; *see Prather v. Prudential Fox & Roach*, 326 F. App'x 670, 672–73 (3d Cir. 2009) (not precedential) (finding *Darden* factors showed plaintiff was employee of temporary staffing agency, not company where she was staffed because she was paid by staffing agency, staffing agency paid her taxes, staffing agency governed her time off and sick days, and staffing agency alone had ability to terminate employment). Linton's work assignments were determined by H&M. *See* ECF No. 90-15 at 8 (indicating Linton worked for H&M on PPL property), 10 (indicating H&M was looking for other assignments for Linton that did not involve PECO property). While Linton's inability to work on PECO's system "certainly had some impact" on H&M's decision to fire him, there is no evidence in the record that the decision to terminate him was made by anyone other than H&M. *Crenshaw*, 201 F. Supp. 3d at 481.

**Riggs was Richardson's Employer in 2023, Not Defendants.**

The same is true for Richardson. It is undisputed that Richardson was hired by Riggs and that he was working for Riggs at the time he was removed from PECO's system. His 2023 W-2 shows that his employer was Riggs, that he was paid by Riggs, and that Riggs paid his taxes. ECF No. 91-27 at 2; *see Prather*, 326 F. App'x at 672–73. Additionally, Richardson was laid off in 2023 by Riggs, not Defendants. There is no evidence in the record that Defendants controlled Richardson's day-to-day assignments when he worked for Riggs or exercised sufficient control over him to support a finding that they were Richardson's employer. Plaintiffs argue that the temporal proximity of Richardson learning that he was not permitted to work on PECO systems and his termination due to a lack of work on non-PECO projects, shows that PECO did exercise sufficient control. The Court disagrees. Like *Crenshaw*, although Defendants' removal of Richardson from the PECO system impacted Riggs's decision to terminate his employment, there is no evidence that the decision to terminate Richardson was made by anyone other than Riggs.

38

**Defendants Played No Role in Lewis's Post-Termination Employment.**

For the same reasons, Lewis's post-termination employment claim fails. He identifies one company with which he sought employment after his termination from EBSC. Lewis claims PDR would not hire him because of what he called "the contractor's ban." ECF No. 97 at 40. However, there is no record evidence that Defendants played any part in PDR's decision not to hire Lewis. It was PDR's decision alone whether to hire Lewis; if it had hired Lewis, PDR would have controlled his pay, his benefits, and his daily employment activities. Accordingly, Lewis has not established an employment relationship between himself and Defendants that continued after he was terminated. *See Campbell v. Drexel Univ.*, 785 F. Supp. 3d 48, 57 (E.D. Pa. 2025) ("An employment relationship exists where the entity pays the individual, has the ability to hire and fire her, and has control over her daily employment activities."). Nothing in the record would allow a reasonable jury to find otherwise.

**Defendants Took No Adverse Employment Action Against Calloway after his Termination.**

Calloway has failed to establish Defendants took an adverse employment action against him with respect to his post-employment claims. To survive summary judgment, Calloway must make out a prima facie case of discrimination, which requires that he show Defendants took an adverse employment action against him. *See Sarullo*, 352 F.3d at 797 (an adverse employment action is an element of a prima facie case of employment discrimination). He has not done so with respect to his post-termination claim.

Calloway identifies the following post-employment adverse employment actions:

he "sought employment with a number of contractors that initially were interested in hiring him but [] informed him that they could not hire him because he was prohibited from working on PECO's system," that "Derrick Williams . . . informed him that [LaFata Group] could not hire him due to his inability to work on PECO's system," and that "he had to accept a position working as an underground splicer" because "he was prohibited from working on PECO's system, projects or property."

ECF No. 116 at 11 (quoting ECF No. 62 ¶¶ 67–68); *see also id.* at 21 n.7. However, Calloway points to no record evidence that Defendants were in any way involved in those decisions. Calloway's own deposition testimony precludes such a finding. Calloway testified that LaFata Group never refused to hire him because he did not actually pursue a position there. ECF No. 98-4 at 17. Calloway's self-selection out of employment does not constitute an adverse employment action taken by Defendants.

That leaves Miller Bros., which Calloway testified "wouldn't take the chance of hiring [him]" after PECO terminated his employment because of "the unclarity with PECO." ECF No. 98-4 at 16. He bases this claim on what he was told by Dave Rosenstein. ECF No. 62 ¶ 67. Calloway did not depose Dave Rosenstein or submit a declaration from him. Setting aside that he relies only on hearsay to link the Contractors Policy to Miller Bros.' refusal to hire him, the proffered evidence does not establish that Defendants took any steps to enforce the Contractors Policy against Calloway or played any role in Miller Bros.' decision not to hire him.

The same reasoning applies to Calloway's decision to accept a position as an underground splicer with Infrasource. Calloway and InfraSource had a "mutual understanding" that "because of the uncertainty" with whether he could work on PECO's system, they "had to go with [Calloway] just being a splicer," which allowed him to fly "under the radar"—*i.e.*, work on PECO's system without notifying PECO. ECF No. 98-4 at 12, 15. There is no record evidence that Defendants were involved in that decision in any way or that Defendants took action to apply the Contractors Policy to Calloway at all. The mere existence of a facially neutral policy is not an adverse employment action. Defendants are, therefore, entitled to summary judgment on Calloway's post-termination discrimination claims.

### B.    Title VII and § 1981 Discrimination under *McDonnell Douglas*

### 1.    Plaintiffs Fail to Make Out a Prima Facie Case of Discrimination.

Under the *McDonnell Douglas* framework, a Title VII or § 1981 plaintiff must first establish a prima facie case of discrimination. *Scheidemantle*, 470 F.3d at 539; *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) (applying *McDonnell Douglas* to § 1981 claim). To make out a prima facie case of discrimination, Plaintiffs must establish (1) they are members of a protected class, (2) they were qualified for the position they held or sought, and (3) they suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *Sarullo*, 352 F.3d at 797. The Court analyzes Plaintiffs' termination-related and post-termination claims under the *McDonnell Douglas* framework because, even if they had established the requisite employment relationship for their post-termination claims, they have still not established prima facie cases of discrimination with respect to any of their claims. It is undisputed that the first two elements are satisfied: Plaintiffs are all members of a protected class and were qualified for their positions. It is also undisputed that Linton and Richardson suffered adverse employment actions when they were terminated from their post-PECO employment; and Richardson, Lewis, and Calloway suffered adverse employment actions when Defendants terminated their employment. Defendants argue that Plaintiffs' prima facie cases of discrimination fail at the fourth element. The Court agrees.

"The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo*, 352 F.3d at 798 (cleaned up). Generally, when relying on comparator evidence to establish discrimination, as Plaintiffs do here, a plaintiff must show he is "similarly situated in all relevant respects to the individuals with whom []he seeks to compare [him]self." *See Oliver*, 921 F. Supp. 2d at 447; *see also Jones v. SEPTA*, No. 12-cv-6582, 2014 WL 3887747, at *5 (E.D. Pa. Aug. 7,

41

2014). The Third Circuit has explained that, in determining whether an employee is similarly situated to another, courts "must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *Monaco v. Am. General Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004). Other relevant factors may include whether the two "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). "And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.* (quoting *Lee*, 574 F.3d at 260). It is the plaintiff's burden in the first instance to establish their proffered comparators are similarly situated, not the defendant's burden to show they are not.

Although a similarly situated comparator is not required to create an inference of discrimination, a plaintiff must provide some evidence that his protected status is one "but-for" cause of the adverse employment decision. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656–57 (2020); *see also Sarullo*, 352 F.3d at 798.

### Linton Has Not Made Out a Prima Facie Case of Discrimination Based on his Removal from PECO's System.

Linton claims Defendants discriminated against him by "kicking him off PECO's system" following the Audit due to his ineligibility under the Contractors Policy. ECF No. 62 ¶ 156. Defendants argue that Linton's claim fails because he has not produced evidence that he was treated differently than "similarly situated" white contractors. Linton identifies one comparator, Gaffney, who was a white contractor identified in the Audit as having been working on Exelon's system without documented approval by HR and who was treated more favorably than Linton.

42

ECF No. 116 at 14. However, Linton has not presented sufficient evidence to allow a jury to find that he and Gaffney were "similarly situated in all relevant respects." *Oliver*, 921 F. Supp. 2d at 447.

The differences between Gaffney and Linton are many. Gaffney was a field coordinator who was discharged in 2014 for poor performance, while Linton was a line mechanic who was discharged in 2020 for violation of rules. ECF No. 95 at 7. Additionally, Gaffney worked for BGE, while Linton worked for PECO. ECF No. 95 at 7. There is no record evidence showing that, despite having different roles at different times and with different companies, Linton's and Gaffney's job responsibilities were similar or they shared the same supervisors. *See Lee*, 574 F.3d at 259–60 ("Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated."). There is also no record evidence showing that Gaffney's "poor performance" was in any way similar, let alone "nearly identical," to Linton's "violation of rules" which led to his termination. *Id.* at 260. Furthermore, the Audit was conducted in March 2023—more than five years after Gaffney's termination but less than five years from Linton's. Therefore, Gaffney was not subject to the five-year mandatory prohibition under the Contractors Policy; Linton was. *See* ECF No. 90-7 at 11. Finally, although Gaffney had a grievance settlement like Linton, the terms of that agreement are not available to the Court, so there is no evidence that its terms are similar to Linton's in any way. ECF No. 95 at 7. Linton does not address, let alone dispute, these differences. He merely states, in conclusory fashion, that Gaffney is similarly situated to Linton. ECF No. 116 at 14. That is not enough.

Furthermore, the Audit appears to have been applied in a racially neutral manner. The Audit identifies seventeen former Exelon employees who were noted as "Do Not Hire." ECF No. 95 at

4. Eight were nondiverse, eight were diverse, and one was unknown. *Id.* Only five of the seventeen were not recommended to work on Exelon systems following the Audit—two minority males, two white females, and one white male. *Id.* at 7. No employee who was discharged due to a rule violation or poor performance within 5 years of the Audit was recommended to work on Exelon's systems.[154] *Id.*

It is Linton's burden to point to evidence sufficient to raise an inference of discrimination. *See Celotex Corp.*, 477 U.S. at 322 (After the moving party shows the absence of a genuine issue of material fact, the burden shifts to the nonmoving party "to make a showing sufficient to establish the existence of . . . element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."); *see also Sarullo*, 352 F.3d at 797 (plaintiff bears burden of showing he suffered adverse employment action under circumstances supporting inference of discrimination). Absent evidence showing Gaffney is similarly situated to him, Linton must point to some other evidence of discrimination. He has not done so. Accordingly, Linton has failed to make out a prima facie case of discrimination. The Court will, therefore, grant summary judgment for Defendants on Linton's Title VII and Section 1981 discrimination claims.

### Richardson Has Not Made Out a Prima Facie Case of Discrimination Based on his Termination from PECO or Riggs.

For the same reasons, Richardson's discrimination claims fail. He has not shown he was treated less favorably than any similarly situated employee. First, with respect to Richardson's termination from PECO, Plaintiffs argue that the chart created by Avery shows: "three similarly

---

[154] The Audit also provided specific criteria for determining whether former employees should be eligible for rehire. ECF No. 95 at 5–6. If the discharge was due to attendance, tardiness, job abandonment, failure to progress for performance issues only, or call out response, the employee likely would be eligible for rehire. *Id.* at 6. One minority female who was discharged due to poor performance in 2022 was recommended to work on Exelon systems because her "poor performance" fell within that category. *Id.* Linton's conduct fell under a different category, which required additional review. *Id.* at 6–7 (Criteria B includes violations of safety violations, fitness for duty, and code of business conduct). The reason given for withholding a recommendation for work on Exelon systems was both that his conduct fell under that category and that his violation had occurred within the last five years. *Id.* at 7.

situated white employees were *not* discharged after their second positive drug test." ECF No. 116 at 19; *see also* ECF No. 96-4. Plaintiffs argue this evidence is "sufficient to raise a strong inference of discrimination . . . ." ECF No. 116 at 19. The Court disagrees. Nothing Plaintiffs point to establishes that Richardson was treated differently than *similarly situated* white employees. *See Oliver*, 921 F. Supp. 2d at 447.

The chart Defendants attached, and Richarson relies on, shows sixteen employees who had a first positive drug or alcohol test before 2000 and a second (and in one instance, third) positive test between 2000 and 2017. ECF No. 96-4. The chart identifies the reason for the test (post-accident, reasonable cause, random, follow up, or other), each employee's race, and the termination date and reason (*e.g.*, Resigned – Forced Alcohol, Discharged – Drug Related, Discharged – Alcohol, Retirement). ECF No. 96-4. It does not identify the employees' positions, job responsibilities, supervisors, or any other circumstances surrounding their positive tests. *See Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (not precedential) (affirming grant of summary judgment and finding plaintiff's purported comparator evidence irrelevant where plaintiff "failed to present evidence suggesting a link between the purported comparators and the motivations of the decision-makers who terminated" plaintiff); *see also Lee*, 574 F.3d at 259–60. The chart lists only one employee who, like Richardson, was terminated after a second positive test that was conducted "post-accident." ECF No. 96-4 at 3. That employee was white and, like Richardson, was discharged. ECF No. 96-4 at 3. This does not establish any similarly situated employee was treated more favorably than Richardson.

With respect to Richardson's subsequent termination from Riggs (assuming Defendants were Richardson's employer), Richardson relies solely on a document Defendants contend is inadmissible double hearsay to establish that but-for Defendants' application of the Contractors

Policy, he would not have been terminated. ECF No. 116 at 19–20; ECF No. 129-2 at 5. The Court need not peel back the layers of hearsay Defendants challenge because the document does not save Richardson's claim. The document, produced by Riggs, states that Richardson was terminated from Riggs due to a lack of work and because "Per Exelon, [Richardson] is not to work on Exelon property." ECF No. 116 at 19–20. Even assuming this document would be admissible at trial, it does not establish a discriminatory motive behind Defendants' application of the Contractors Policy to Richardson, nor does it establish Richardson was treated differently from other similarly situated contractors. Plaintiffs concede the Contractors Policy is facially neutral. Richardson admits that, at the time of his termination from Riggs, he was not eligible to work on Exelon projects under the Contractors Policy. He provides no circumstantial evidence supporting an inference of discrimination.

At the first stage of the *McDonnell Douglas* framework, it is the plaintiff's burden to produce evidence establishing discrimination—*i.e.*, that he was treated differently than similarly situated individuals. *See Celotex Corp.*, 477 U.S. at 322; *Sarullo*, 352 F.3d at 797–78. Richardson has not met this burden. Summary judgment will be granted in favor of Defendants on Richardson's Title VII and Section 1981 claims.

### Calloway Has Not Made Out a Prima Facie Case of Discrimination Based on his Termination from PECO.

Similarly, Calloway has failed to identify similarly situated comparators to establish a prima facie case of discrimination. Calloway raises a discrimination claim based on his termination from PECO following his positive drug test. ECF No. 62 ¶¶ 144–48. In support of his claim, he also relies on evidence of comparators he contends were treated more favorably. He points to a number of white employees whom he believes were not discharged even after testing positive for drugs or alcohol multiple times, but he provides no evidence that those employees filled a similar

position, were tested for drugs or alcohol in a post-accident test, or were found to be dishonest in the following investigation. No reasonable jury could conclude that these individuals were similarly situated to Calloway in order to infer discrimination.

Defendants submitted evidence showing Calloway was not just terminated because he violated the Drug and Alcohol Policy but because he also provided an implausible explanation for the positive test, which violated the Code of Conduct. *See* ECF No. 93-21 at 3 (summarizing basis for recommendation of termination). Calloway does not dispute that he was terminated after PECO determined he was dishonest in the investigation, nor does he assert any of the comparators he identified were found to have been similarly dishonest in an investigation. Accordingly, he has failed to establish discrimination as part of his prima facie case. *See Distajo v. PNC Bank, N.A.*, No. 09-2712, 2009 WL 3467773, at *4 (E.D. Pa. Oct. 27, 2009) ("While allegations of dissimilar treatment of non-minority employees who engaged in conduct similar to Plaintiff's could give rise to an inference of discrimination, Plaintiff's allegations concerning other employees did not involve conduct that was similar to Plaintiff's, *i.e.*, dishonesty in the course of an investigation.").

Plaintiffs argue in opposition that *Defendants* failed to establish that the individuals are *not* similarly situated to Calloway. ECF No. 116 at 20–23. This misses the point. It is Plaintiffs' burden in the first instance to establish a prima facie case of discrimination—this includes that he was treated less favorably than *similarly situated* non-minority employees. *See Sarullo*, 352 F.3d at 798; *see also Oliver*, 921 F. Supp. 2d at 447 (pointing to white employees who were not disciplined or terminated is insufficient absent evidence showing they engaged in the same conduct, it was witnessed by the same decisionmaker, or that they were at a similar disciplinary level as plaintiff). Calloway has not carried his burden, so the Court grants summary judgment on his discrimination claim.

**Lewis Has Not Made Out a Prima Facie Case of Discrimination Based on his Termination from EBSC.**

Lewis also has not produced sufficient evidence to raise an inference of discrimination. His discrimination claim is based on his termination for violations of the Sexual Harassment Policy and Code of Business Conduct. ECF No. 62 ¶¶ 159–63. Lewis identified four white employees in the TAC whom he contends "engaged in more egregious sexual misconduct and were afforded the opportunity to voluntarily resign or retire in lieu" of termination and another white employee who was allowed to resign and remained eligible to work on Exelon properties as a contractor. ECF No. 116 at 26. With respect to white employee Goetz, Lewis submitted a 36-page document (without identifying any specific page number supporting his argument) showing only that Goetz retired and was provided with severance pay. *See* ECF No. 120-13. With respect to Ludwig, Lewis provides an anonymous complaint indicating that Ludwig and Levine, who were both managers and therefore, not a subordinate and supervisor, were sexually involved and that Levine was allegedly sexually involved with other employees. ECF No. 120-14.

However, there is no record evidence establishing that any of those employees were similarly situated to Lewis. Lewis does not establish they worked in the ESOC or the same office, had the same supervisors, or even engaged in the same misconduct. *See Carey v. Fed. Express Corp.*, 519 F. App'x 772, 776 (3d Cir. 2013) (per curiam) (not precedential) (holding that plaintiff "failed to show that [another] employee was, in fact, similarly situated" where "the other employee did not work in the same regional office or for the same supervisors" as plaintiff); *Opsatnik*, 335 F. App'x at 223 (affirming grant of summary judgment to employer where, *inter alia*, a majority of comparators did not work in plaintiff's division and so "were not subject to the authority of the [same] decision-makers," thus providing no evidence to suggest "a link between the purported comparators and the motivations of the decision-makers who terminated" the plaintiff). It is

unclear whether any of the purported comparators directly supervised the employees with whom they engaged in sexual relationships. In fact, the evidence Plaintiffs submitted establishing Ludwig's reported misconduct was found not to implicate a code violation because the reported romantic relationship was "between peers," not a supervisor and subordinate. ECF No. 120-14 at 1.[155]

Lewis's comparator evidence, therefore, cannot support an inference of discrimination. Absent some additional evidence of discrimination, which Lewis does not present, the Court must grant summary judgment to Defendants on Lewis's discrimination claims.[156]

### 2.       Defendants Have Put Forth a Legitimate, Nondiscriminatory Reason for Plaintiffs' Termination and Removal from their Systems as Contractors

If Plaintiffs had established a prima facie case of discrimination, which they have not, the burden of production would shift to Defendants to articulate a legitimate, nondiscriminatory reason for their decisions. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion

---

[155] The Declaration of Tonya Baña, which the Court has stricken, provides that "upon information and belief," certain witnesses would testify as to investigations into Goetz's sexual misconduct. *See* ECF No. 120-15 ¶¶ 4, 6–8. Even if the Court were to consider this declaration, it still does not establish that the purported comparators were similarly situated in all relevant respects to Lewis. Indeed, the declaration shows each purported comparator served in a different role, at a different level, and in what appears to be a different department from Lewis. *Id.* ¶¶ 8–10 (Goetz served as Exelon's Vice President and Chief Security Officer when he retired, Joseph Dominguez served as CEO of Exelon Generation at the time of his separation, and David Fein served as Exelon's Senior Vice President of Governmental and Regulatory Affairs at the time of his separation.); *compare* ECF No. 62 ¶ 126 (Lewis served as a supervisor in Exelon's Security Operations Center). Absent some link between Lewis and the purported comparators, the comparator evidence cannot support an inference of discrimination. *See Opsatnik*, 335 F. App'x at 223; *Lee*, 574 F.3d at 260.

[156] Defendants also argue that the race-related comments by Shipp cannot support Lewis's termination-related discrimination claim because Shipp had no involvement in the termination decision and they were too temporally attenuated. ECF No. 92-2 at 27. Plaintiffs do not respond to this argument or attempt to use Shipp's comments as support for Lewis's termination claim. Nonetheless, the Court agrees with Defendants. *See Udasco-Kist v. Thomas Jefferson Univ. Hosp., Inc.*, No. 21-1146, 2022 WL 2805131, at *3 (3d Cir. July 18, 2022) (not precedential) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992), *abrogated in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* Defendants' burden is "relatively light" because they need not prove the reason "*actually* motivated [their] behavior"; that burden remains with Plaintiffs. *Id.*

Here, Defendants have pointed to the Exelon and PECO Drug & Alcohol Policies, the Code of Conduct, and the Sexual Harassment Policy as legitimate, nondiscriminatory reasons for Plaintiffs' termination. *See* ECF Nos. 90-15, 91-9, 93-7 (PECO Drug & Alcohol Procedure); ECF Nos. 91-7, 93-6 (Exelon Drug & Alcohol Policy); ECF Nos. 91-6, 93-9 (Exelon Code of Conduct); ECF No. 92-5 (Exelon Sexual Harassment Policy). They further point to the Contractors Policy as a legitimate, nondiscriminatory reason for Linton's and Richardson's removal from PECO's systems and for Calloway's and Lewis's ineligibility to work on PECO systems after their termination. *See* ECF Nos. 90-7, 91-13, 93-12, 92-18 (2020 Contractors Policy); ECF No. 92-17 (2023 Contractors Policy). Plaintiffs do not dispute that their employment was terminated for violations of the identified policies or that they did indeed violate those policies. Nor do Plaintiffs dispute that under the Contractors Policy, they were ineligible to work on Exelon systems at the time of the events giving rise to this lawsuit.

Instead, Plaintiffs respond to Defendants' arguments related to their reasons for termination by conflating this stage of the *McDonnell Douglas* framework with the next—that Plaintiffs must establish Defendants' proffered reason is pretextual. *See* ECF No. 116 at 14–15 (pointing to comparator evidence to argue "Defendants failed to meet their burden of articulating a legitimate, non-discriminatory reason for revoking Linton's access to PECO's system when they allowed a similarly situated white contractor to continue working on Exelon's system"), 19 (similar as to Richardson's claim), 22–23 (similar as to Calloway's claim).

50

Plaintiffs' argument that the Drug & Alcohol Policies provide only for suspension, not termination, of employees following a first positive drug or alcohol test, *see* ECF No. 116 at 21, is belied by the policies themselves. Plaintiffs cherry-pick one part of the policy—"Non-exempt employees will be suspended for a first violation for at least three days"—and ignore the context. *Id.*; *see also* ECF No. 93-6 at 11; ECF No. 93-7 at 4. The paragraph Plaintiffs cherry-pick applies when "an employee is not terminated for a first violation," ECF No. 93-6 at 11; ECF No. 93-7 at 4, which, contrary to Plaintiffs' framing, does contemplate termination of employment following a first positive drug or alcohol test. *See* ECF No. 93-6 at 10 ("Determination of an impermissible level of drugs or alcohol in the system of any employee (i.e., a positive test result) while on duty, on Company property, or in Company vehicles is grounds for disciplinary action, up to and including immediate termination from employment."); ECF No. 93-7 at 3 ("The impairment of any employee by drugs or alcohol or the impermissible level of drugs or alcohol in the system of any employee (i.e., a positive test result) while on duty or on Company property is grounds for disciplinary action, up to and including immediate termination from employment. . . . Off-the-job drug use . . . is grounds for disciplinary action, up to and including immediate termination of employment.").

The policies undisputably apply to Plaintiffs' conduct. Accordingly, the Court finds Defendants have satisfied their "relatively light" burden of identifying a legitimate, nondiscriminatory reasons for Plaintiffs' termination and subsequent ineligibility to work as contractors, and the Court moves on to determine whether Plaintiffs have established those reasons are pretextual.

### 3.    Plaintiffs Have Not Pointed to Evidence Showing Defendants' Proffered Reasons Were Pretextual.

Once Defendants have identified a legitimate, nondiscriminatory reason for the unfavorable employment decision, the burden shifts back to Plaintiffs to "point[] to 'some' evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated (pretextual)." *Fuentes*, 32 F.3d at 764. To satisfy this burden, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765 (cleaned up).

Linton appears to argue that the Contractors Policy was pretextual because Linton's ability to work as a contractor on PECO systems was governed by his settlement agreement. ECF No. 116 at 14. Even if that were true, the settlement agreement granted PECO or Exelon the sole discretion to decide whether Linton could work on Exelon projects or property. ECF No. 90-13 ¶ 6. Although Linton argues that the Contractors Policy could apply to him only when it is not contradicted by the terms of negotiated agreements, he does not explain how the settlement agreement contradicts the Contractors Policy. Defendants retained discretion under the settlement agreement to bar Linton from working on Exelon's systems pursuant to the Contractors (or any other) Policy. Exercising that discretion does not make Defendants' proffered reason unworthy of credence or support an inference of pretext.

Richardson does not point to evidence establishing PECO's application of the Drug & Alcohol Procedure or Contractors Policy to Richardson was pretext for actual discrimination. His reliance on purported comparators is insufficient, as discussed above, because he has not established any former employee who was not discharged after a second positive drug test was

52

similarly situated to him. Furthermore, although Richardson argues his 2020 positive drug test was his first, he readily admitted that he had previously had a positive drug test. ECF No. 96-3 at 35. At his deposition, he also admitted that the allegation in the Complaint stating that he was terminated for his first positive test was "false." ECF No. 96-3 at 34. The only evidence in the record that would indicate otherwise is Richardson's "belief" that the first test was expunged in 1997, which is based on what he heard from his union representative and from unnamed supervisors and foremen. ECF No. 96-3 at 9–10, 35–36. This "belief" is not sufficient to show the first positive drug test was expunged or that PECO ever had a policy allowing for such expungement. Plaintiffs must produce *evidence* of pretext, not merely unsubstantiated beliefs.

Nor does Richardson identify any evidence showing his post-termination removal from Exelon systems was motivated by anything other than the Contractors Policy. The existence of the facially neutral policy alone does not show it was applied in a discriminatory way.

Likewise, Calloway points to no evidence that Defendants' proffered reason for his termination under the applicable policies was pretextual. His only argument relies on the white employees he contends violated the Drug and Alcohol Policy but were not terminated. However, as discussed above, none of his purported comparators were terminated after being dishonest in an investigation. Therefore, he does not establish they were similarly situated to him to support an inference of pretext.

Finally, Lewis points to no evidence that Defendants' proffered reason for his termination—violation of the Sexual Harassment Policy—was pretextual. As noted above, he does not provide admissible evidence of similarly situated non-minority employees who were treated more favorably than he was or that anyone involved in the decision to terminate him was motivated by discriminatory animus. Plaintiffs' claims that other employees were treated more favorably,

which he bases on "grapevine information" and "enterprise gossip" are simply not enough to survive summary judgment. *See, e.g.*, *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013).

Because Plaintiffs have failed to rebut Defendants' proffered legitimate, non-discriminatory reasons for terminating their employment and removing them from their systems as contractors, Defendants are entitled to summary judgment on all discrimination claims.

## IX.     Retaliation

Linton and Calloway each also raised retaliation claims. To make out a prima facie case of retaliation, a plaintiff "must tender evidence that (1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (cleaned up). Courts in the Third Circuit "focus[] on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). "Timing must be unusually suggestive of retaliatory motive before a causal link will be inferred" based on timing alone. *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 652 (E.D. Pa. 2012) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)) (finding nine months was not "so 'unusually suggestive' such that it will create an inference of retaliation," and absent evidence that decisionmakers knew of the complaints, plaintiff failed to establish a causal link to support retaliation claim).

### A.     Linton Has Not Made Out a Prima Facie Retaliation Claim.

Linton has satisfied the first element—he engaged in protected activity when he submitted two complaints: a complaint to Exelon's ethics office dated March 29, 2023, *see* ECF No. 120-3

at 4, and an EEOC charge of discrimination dated September 3, 2023. *See* ECF No. 90-23. For the second element, Linton contends he suffered adverse employment actions (1) when he was removed from PECO's system and (2) when Defendants refused to grant him permission to work on PECO systems unless he agreed to a waiver of claims in connection with settling these claims.

Linton cannot base a retaliation claim on the first adverse action because his removal from PECO's system pre-dated any of his protected activity. There can be no causal link between an adverse employment action and protected activity where the adverse action predates the plaintiff's engagement in protected activity. *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 263 (3d Cir. 2017).

Linton cannot base a retaliation claim on Defendants' demand that he waive his claims in exchange for permission to work on PECO's systems because requiring Linton to release his claims in exchange for the benefit of working on PECO's system is not an adverse employment action. "It is hornbook law that employers can require terminated employees to release claims in exchange for benefits to which they would not otherwise be entitled." *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 448 (3d Cir. 2015); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) ("[P]resumably an employee may waive his cause of action under Title VII as part of a voluntary settlement[.]"); *Haynes v. Reading Hospital*, No. 25-cv-4992, 2026 WL 161769, at *6 (E.D. Pa. Jan. 21, 2026).

In *EEOC v. Allstate Insurance Company*, Allstate changed its business model and terminated employees who worked under the previous models. 778 F.3d at 446–47. Employees who would otherwise be terminated were given the option to convert to contractor status but only if they signed a release of all legal claims against the company, including Title VII claims. *Id.* at 447. The employees and the EEOC sued, claiming Allstate's refusal to allow former employees to

convert to contractor status if they refused to sign the release constituted retaliation for engaging in protected activity. *Id.* at 448. The Third Circuit affirmed the district court's grant of summary judgment, explaining that even if a refusal to sign the release was protected activity, requiring an employee to release claims in exchange for an unearned benefit does not constitute an adverse employment action. *Id.* at 452. Importantly, the benefit there was "unearned" because the terminated employees were not entitled to convert to independent contractor status. *Id.*

Here, too, Defendants had the right to require Linton to release his claims in exchange for benefits to which he otherwise was not entitled. Linton does not argue he was entitled to work as a contractor on PECO's systems. Nor could he. The Contractors Policy specifically prohibits him from doing such work. Although Linton argues the settlement agreement, not the Contractors Policy, governed his ability to work as a contractor, that does not entitle him to work on PECO systems. Under the settlement agreement, PECO and Exelon retained sole discretion to determine whether Linton could work on PECO or Exelon projects or property. *See* ECF No. 90-14 at 3. Absent the identification of an actionable adverse employment action, Linton's retaliation claim fails as a matter of law.

### B.    Calloway Has Not Made Out a Prima Facie Retaliation Claim.

Calloway's retaliation claims rest on complaints he made to PECO regarding racial discrimination between 2019 and 2021. Defendants argue "[a]ny possible causal link is broken by (1) the fact that more than a year passed between his last complaint and his termination (and any resulting ban from Exelon's system), and (2) relevant intervening events, including Calloway's positive drug test and his dishonesty in the following investigation." ECF No. 98 at 41. Plaintiffs do not respond to this argument. *See* ECF No. 116 at 20–23.

Courts in the Third Circuit "focus[] on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll.*

56

*of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). "Timing must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Miller*, 908 F. Supp. 2d at 652 (quoting *Krouse*, 126 F.3d at 503). Absent "immediate" temporal proximity, a plaintiff must show some other evidence of ongoing antagonism. *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 617 (E.D. Pa. 2024) (collecting cases, explaining "the temporal proximity must be immediate," and finding one week not unusually suggestive).

On July 16, 2020, Calloway sent an email to Exelon CEO Calvin Butler describing "a strong racial bias and discrimination towards African Americans here at Peco underground department." ECF No. 93-25 at 2. On July 17, 2020, he forwarded that email to PECO CEO John McDonald. *Id.* at 4. On July 23, 2020, he submitted an ethics complaint, alleging "discrimination and racial bias against African Americans in PECO's Philly Underground department." ECF No. 93-26. Then, on July 1, 2021, he sent a text message to a colleague[157] describing mistreatment of Black employees on "the cable gang." ECF No. 93-27. Calloway contradictorily testified this was the last "complaint" he made at PECO regarding race discrimination, and that he also made a complaint a year later, on June 11, 2022. ECF No. 93-27; ECF No. 98-4 at 46–47. There is no other evidence of the 2022 complaint in the record. *See* ECF No. 98-4 at 45–46.

Nonetheless, even assuming Calloway made a complaint on June 11, 2022, PECO did not terminate his employment until October 21, 2022—over four months later. That link is not so "unusually suggestive" as to support an inference of a causal link. *See Miller*, 908 F. Supp. 2d at 652 (nine months is not unusually suggestive); *Kier*, 72 F. Supp. 3d at 617 (temporal proximity

---

[157] Although not explained by the parties, it appears the colleague, Jennifer Hanna, was Linton's Manager or Director at some point. *See* Linton Grievance Documentation, ECF No. 120-10 at 14. It is not clear whether Hanna had any supervisory authority over Calloway. Calloway did not depose or provide a declaration from Hanna.

must be immediate). Calloway does not identify further antagonism toward him to support an inference of a causal link.

Furthermore, Defendants correctly point out that the intervening events—Calloway's positive drug test and dishonesty during the investigation—would break any causal link absent some evidence that the drug test itself was motivated by discriminatory animus. "[A] causal link between an employee's protected activity and an adverse employment action against that employee may be broken by intervening events." *Kier*, 72 F. Supp. 3d at 618 (quoting *Outten v. Genesis Health Care, LLC*, No. 13-4708, 2014 WL 3964918, at *12 (E.D. Pa. Aug. 12, 2014)) (explaining plaintiff produced no evidence to establish his protected activity one week before his termination was the motivating factor, as opposed to a harsh customer complaint, which was discovered two days before his termination). Calloway has presented no other evidence of discriminatory animus related to his retaliation claim. Summary judgment must, therefore, be granted.

## X.        Hostile Work Environment

Title VII prohibits harassment "that is 'sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (brackets omitted). A plaintiff raising a hostile environment claim must prove: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) it detrimentally affected him; (4) it would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for *respondeat superior* liability. *Id.* Defendants challenge whether Lewis has established severe or pervasive harassment.

In determining whether discrimination is severe or pervasive such that it amounts to a hostile environment, courts must consider the totality of circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

58

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel*, 706 F.3d at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The plaintiff must produce evidence showing "the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); *see also Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). Generally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up).

A plaintiff may satisfy this showing with evidence of either severe or pervasive harassment. *De Piero v. Pennsylvania State Univ.*, 769 F. Supp. 3d 329, 348 (E.D. Pa. 2025). Determining whether harassing conduct is severe or pervasive requires consideration of two separate standards. "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). In other words, if a single incident is "extremely serious," it may amount to a change in the plaintiff's work conditions. *See Faragher*, 524 U.S. at 788. Absent such severe misconduct, a plaintiff may establish a hostile work environment by showing the misconduct was pervasive. This allows a plaintiff to aggregate incidents of discrimination that, even if not serious enough to be individually actionable, may combine to create "the cumulative effect of a thousand cuts." *De Piero*, 769 F. Supp. 3d at 348 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127–28 (3d Cir. 2006)).

Lewis's hostile work environment claim is based on comments made by his supervisor, Stephen Shipp, over the course of Lewis's seventeen months of employment. Plaintiffs' Opposition lacks any citation to legal authority and any legal analysis specific to the standard for what amounts

to severe or pervasive conduct. However, the Opposition at least identifies the following comments

by Shipp as those Lewis contends created a hostile work environment:

- June 2023—Asking Lewis why "[B]lack females can never get along in the work environment." ECF No. 97 at 85–86; ECF No. 92-14.

- June 2023—Describing a Black employee as "angry and aggressive." Charge of Discrimination, ECF No. 92-15.

- August 2023—Telling Lewis in the presence of several colleagues that he should urinate outside but he wouldn't want people to see his "big, black dick." ECF No. 97 at 91–92.

- March 2024—Asking a Black coworker if they had been "involved in a drug [deal]." *Id*. at 117–18; ECF No. 92-13.

- March 2024—Saying that Black women have "attitudes." ECF No. 97 at 106; ECF No. 92-13.

- March 2024—Telling Lewis, "You're a black man with a gun. Everybody's scared of that. ECF No. 97 at 116; *see also* ECF No. 92-13 at 4.

- Describing a Black former employee as "ratchet." ECF No. 97 at 87.

ECF No. 116 at 27–28. Lewis further contends that Shipp subjected him to disparate treatment

based on his race. He points to his EEOC charge of discrimination, where he alleged that "Mr.

Shipp undermined my authority as a supervisor by backing up [Supervisor Nicholas] Snyder after

he improperly authorized my subordinate to clock in an hour early," that he only circulated the

resumes of new applicants to Snyder, and that he did not make certain trainings available to Lewis

but made them available to Snyder. ECF No. 92-15 at 3; *see also* ECF No. 92-13 (noting "Shipp

also advised he sent Snyder new applicant resumes but he didn't send to me for review").

## A. Lewis Has Identified Inappropriate and Offensive, But Not "Severe," Misconduct.

The Court begins with the question of whether the misconduct Lewis identifies, taken as a

whole, constitute severe harassment. Generally, "[d]iscourtesy or rudeness should not be confused

with racial harassment," and "a lack of racial sensitivity does not, alone, amount to actionable

harassment." *Faragher*, 524 U.S. at 787 (alteration in original) (citing 1 B. Lindemann & P.

60

Grossman, *Employment Discrimination Law* 349, and nn. 36–37 (3d ed. 1996)). Thus, inappropriate and offensive comments or racial slurs, without more, do not cross the threshold into the type of misconduct the Third Circuit has recognized as severe. *See, e.g.*, *Castleberry*, 863 F.3d at 265–66 ("Plaintiffs alleged that their supervisor used a racially charged slur in front of them and their non-African-American coworkers. Within the same breath, the use of this word was accompanied by threats of termination (which ultimately occurred). This constitutes severe conduct that could create a hostile work environment."); *Starnes v. Butler Cnty. Ct. of Com. Pl., 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (finding severe harassment where the plaintiff's supervisor "coerced her into engaging in sexual relations, shared pornography with her, asked her to film herself performing sexual acts, engaged in a pattern of flirtatious behavior, scolded her for speaking with male colleagues, assigned her duties forcing her to be close to him, and treated her differently than her male colleagues"); *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 215 (3d Cir. 2017) (finding severe harassment where the plaintiff's employer "made sexually charged comments to her"; "grabbed her" and "attempted to take her shirt off"; "called her into his office, and when she entered" encountered him "sitting naked on a chair"; and, "sent her a text message stating 'am I getting all three holes' and thereafter showed up at her house uninvited and pressured her into having sex with him by threatening her job"); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146–47 (3d Cir. 1999) (finding severe harassment where a supervisor told the plaintiff that she "made too much money" for a woman, belittled her, and "grabbed [her] buttocks from behind while she was bending over her files and told her that she smelled good").

Likewise, courts in this District have found more egregious conduct than Shipp's insufficient to meet the severity threshold required for a hostile work environment claim. *See, e.g.*, *Tourtellotte v. Eli Lilly & Co.*, No. 09-0774, 2013 WL 1628606, at *6 (E.D. Pa. Apr. 16, 2013)

(Tucker, J.) (commenting on having not known a Black person as a child, requesting that Black employee speak English, commenting that Black people do not speak fast, and making a statement about "suckling the corporate breast" while gesturing to breastfeeding mother-employees did not approach "serious" level of offensiveness for race-based or gender-based hostile work environment claim), *aff'd*, 636 F. App'x 831 (3d Cir. 2016); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 694–95 (E.D. Pa. 2016) (Stengel, J.) (two uses of n-word not severe or pervasive, nor was supervisor telling plaintiff that "if I was your husband I would beat the crap out of you" and calling her a "stupid immigrant" and "bitch" who should return to her own country, even when combined with less favorable assignments and dumping purse into dirty laundry), *aff'd* 769 F. App'x 57 (3d Cir. 2019); *McCall v. Thomas Jefferson Univ. Hosp.*, No. 21-5338, 2024 WL 6973141, at *5 (E.D. Pa. Jan. 23, 2024) (Diamond, J.) (calling plaintiff "lazy N-word" twice and leaving notes purporting to instruct him how to do his job and calling him "lazy as shit" not severe or pervasive); *Samuel v. Target Realty, LLC*, No. 19-2203, 2021 WL 4774858, at *15, *17 (E.D. Pa. Oct. 13, 2021) (Goldberg, J.) (no hostile work environment despite repeated racist comments, including coworker's use of the n-word, his comments about "[B]lack people loving chicken," his statement that a supervisor would not rent to the plaintiff because "she's not turning this into the hood or the ghetto," his decision to share a racially offensive skit, and management's failure to remove a stuffed monkey the plaintiff found hanging from a noose from the ceiling of an apartment that he was expected to clean and coworker's comment that the monkey looked like plaintiff); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607, 610–11 (E.D. Pa. 2001) (Joyner, J.) (no hostile work environment where Black plaintiff's supervisor called Black community a "baby factory," said that Black people are incapable of thinking analytically, and warned plaintiff not to talk to white women); *Morgon v. Valenti Mid-Atl. Mgmt.*, No. 01-134, 2001 WL 1735260, at *2–4 (E.D. Pa.

62

Dec. 14, 2001) (Buckwalter, J.) (no hostile work environment where supervisor referred to the Jamaican plaintiff by the n-word and told her she is illiterate, and said she would prefer not to hire Jamaicans, and other co-workers also used the n-word, because other than two incidents, conduct was not tied to plaintiff's race).

Here, Lewis identifies a number of inappropriate, offensive comments by his supervisor, which he contends created a hostile environment. Those that were based on Lewis's race include a comment on his "big, black dick," and a statement that "You're a black man with a gun. Everybody's scared of that." ECF No. 97 at 91–92, 116; *see also* ECF No. 92-13 at 4. The other comments Lewis identifies, though they may be considered as part of the totality of circumstances demonstrating discriminatory animus, were not directed toward nor were they about Lewis. None of the comments were accompanied by threats to Lewis's job, none were physically threatening, and none were accompanied by any kind of assault. *See Nitkin v. Main Line Health*, 67 F.4th 565, 572 (3d Cir. 2023); *see also De Piero*, 769 F. Supp. 3d at 349 ("The Third Circuit has vindicated severe harassment hostile work environment claims only when they are predicated on 'extremely serious' misconduct, such as the use of racial slurs accompanied by threats of termination, or sexual harassment and assault." (citations omitted)). Accordingly, the comments Lewis identified do not amount to "severe" harassment that would create a hostile work environment.

### B. The Conduct Lewis Identifies Is Not Pervasive.

The Court does "not look to the number of incidents in a vacuum. Rather, we consider the frequency of the allegedly discriminatory conduct in the context of a given case." *Nitkin*, 67 F.4th at 571. Isolated or sporadic incidents do not qualify as "pervasive and regular." *Ocasio v. Lehigh Valley Family Health Ctr.*, 92 F. App'x 876, 880 (3d Cir. 2004). Rather, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady

63

barrage of opprobrious racial comments." *Bondaruk v. PNC Bank*, No. 20-5979, 2022 WL 4120281, at *7 (E.D. Pa. Sept. 9, 2022) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). Generally, courts are also hesitant to find a hostile work environment based on comments not made directly to the plaintiff. *See De Piero*, 769 F. Supp. 3d at 351 (quoting *Watkins v. Pa. Dep't of Corr.*, No. 22-1426, 2023 WL 5925896, at *4 (3d Cir. Sept. 12, 2023)) ("'[C]omments not made directly' to the plaintiff are less likely to cause a court to deem such conduct sufficiently pervasive, as they are more akin to 'offhand comments.'").

The comments Lewis identifies, while the Court does not condone them or minimize their offensiveness, simply do not meet the pervasiveness standard. Even when drawing all inferences in Lewis's favor, the record demonstrates that he was not continuously harassed "on a daily or even a weekly basis" over the seventeen months of his employment or even the nine months during which he documented Shipp's comments. *Deans v. Kennedy House, Inc.*, 998 F. Supp.2d 393, 416 (E.D. Pa.), *aff'd*, 587 F. App'x 731 (3d Cir. 2014). Instead, the incidents were more "sporadic." *Id.*

Lewis identifies only three comments directed toward him, close to eight months apart. Even considering all of the racially motivated comments Lewis identifies, regardless of to whom they were directed or about whom they were made, there are only seven spread out over his seventeen months of employment. *See* ECF No. 116 at 27–28. Courts have interpreted similarly infrequent conduct as failing to meet the pervasiveness requirement. *See, e.g.*, *Rosati v. Colello*, 94 F. Supp. 3d 704, 716 (E.D. Pa. 2015) (Dalzell, J.) (three incidents over four months "do not rise to the level of severe and pervasive discrimination"); *Stephenson v. City of Philadelphia*, No. 05-1550, 2006 WL 1804570, at *11 (E.D. Pa. June 28, 2006) (O'Neill, J.) (nine incidents over nineteen months "lack the frequency to constitute a hostile work environment claim"), *aff'd*, 293 F. App'x 123 (3d Cir. 2008); *Hamera v. County of Berks*, 248 F. App'x 422, 425-26 (3d Cir. 2007) (not

64

precedential) (harassing comments were not pervasive where plaintiff's coworkers "made nine comments over a year and four months"); *Lulis v. Barnhart,* 252 F. Supp. 2d 172, 177–78 (E.D. Pa. March 24, 2003) (Rufe, J.) (holding that nine incidents over the course of seventeen months did not amount to pervasive conduct); *Cooper-Nicholas v. City of Chester,* No. 95–6493, 1997 WL 799443, at *3 (E.D. Pa. Dec. 30, 1997) (Reed, J.) (eight incidents of "unprofessional, offensive, and callow" sexual remarks over nineteen months not sufficiently "frequent or chronic"). While offensive and distasteful, this is insufficient to satisfy the standard for pervasiveness required to establish a hostile work environment claim. Lewis does not argue otherwise. *See* ECF No. 116 at 26–27 (listing seven comments and concluding they created a hostile environment without citation to a single relevant legal authority).

Although Lewis contends generally that Shipp "made racial comments" frequently during his employment, ECF No. 97-73, he only specifically identified the seven instances outlined above. "[G]eneralized assertions of harassing conduct" are properly disregarded. *Nitkin*, 67 F.4th at 570. Finally, with respect to Lewis's claims that Snyder was provided more training opportunities than Lewis, there is insufficient record evidence as to who Snyder is in order for a reasonable jury to find that Lewis's exclusion from those opportunities was due to his race.[158] *See* ECF No. 116 at 28; ECF No. 92-15 at 3.

In sum, taken as a whole, the isolated incidents Lewis can identify do not rise to the level of severity or pervasiveness required to establish a hostile work environment claim. Defendants are, therefore, entitled to summary judgment on this claim.

---

[158] Lewis identified Nick Snyder as a white supervisor in his deposition testimony. ECF No. 97 at 77. Snyder was present for certain of the incidents Lewis describes. *See* ECF No. 97 at 76–77, 84–85, 91.

## XI.    Conclusion

For the foregoing reasons, Plaintiffs will be granted leave to file their opposition out-of-time and Defendants' related motion to consider their summary judgment motions uncontested will be denied. Defendants' motion to strike will be granted only with respect to the declaration of Plaintiffs' Counsel; it is otherwise denied. Summary judgment will be entered in Defendants' favor on all of Plaintiffs' claims. In reaching its conclusions, the Court has considered Plaintiffs' Opposition, with the exception of the declaration of counsel, consistent with the partial grant of Defendants' Motion to Strike.